[L. A. No. 16044. In Bank.—March 26, 1937.]

Q. A. KNOUSE, Appellant, v. WALT NIMOCKS, Executor, etc., Respondent.

[L. A. No. 16045. In Bank.—March 26, 1937.]

WALTER S. NIMOCKS, Executor, etc., Respondent, v. M. L. KNOUSE et al., Appellants.

[L. A. No. 15549. In Bank.—March 26, 1937.]

WALTER S. NIMOCKS, Executor, etc., Respondent, v. Q. A. KNOUSE, Appellant.

William Ellis Lady for Appellants.

W. C. Shelton and George W. Burch, Jr., for Respondent.

CURTIS, J.—The above-entitled actions were consolidated and heard together in the superior court, and also in the District Court of Appeal, one opinion having been rendered in the decision of all three cases, as will more fully appear hereinafter. They were transferred to this court for the reason that the record in one of said cases showed that Judge Roth, who wrote the opinion in the District Court of Appeal, had previously ruled upon a demurrer filed in said action when the same was pending in the superior court. ▮ Section 170a of the Code of Civil Procedure, provides that a justice or judge before whom a cause or question may have been tried or heard shall not sit or act in an appellate tribunal, on the trial or hearing of such cause or question. This provision of the code disqualified Judge Roth from hearing or participating in the decision of said cause in the District Court of Appeal. Just what effect this disqualification of Judge Roth might have had upon the decision of the District Court of Appeal, had we not granted a transfer of said cause, is now a matter of no consequence. ▮ The opinion and decision of the District Court of Appeal, by our order of transfer, have become a nullity and are of no force or effect, either

as a judgment or as an authoritative statement of any principle of law therein discussed. As stated by us in a former action, the opinion may serve as a brief on the legal questions involved therein, and may be adopted by this court as its opinion in the pending action. (*Estate of Kent*, 6 Cal. (2d) 154, 156 [57 Pac. (2d) 901].) But without some further express act of approval or adoption of said opinion by this court, that opinion and decision are of no more effect as a judgment or as a precedent to be followed in the decision of legal questions that may hereafter arise than if they had not been written. Nothing that was said in the case of *Kaysser* v. *McNaughton*, 6 Cal. (2d) 248, 256 [57 Pac. (2d) 927], may be taken as declaring a different rule. There appears to be a sharp conflict in the authorities as to the legal status of a decision handed down by a court consisting of a number of members in which a disqualified member participates. (Cor. Jur., p. 1023, sec. 202.) For the reason just stated, we are not now concerned with this question. The order of transfer of said cause to this court for hearing was largely prompted by the situation that the opinion of the District Court of Appeal was prepared, and the decision participated in, by a disqualified member of the court rather than by any disagreement on our part with the conclusion reached therein. The opinion prepared by Judge Roth disposes of all questions presented on the appeal which were material to the issues involved. From an examination of the evidence, including the original exhibits in the case, and the law applicable to the facts as found by the court, we find ourselves in perfect accord with the statement of the case as made by Judge Roth and the conclusions reached by him as set forth in the opinion prepared by him. We therefore adopt the same as the opinion of this court. It is as follows:

"The three cases herein involved were tried together in the court below, because all actions arise out of the same relationship; and the same evidence, except for the peculiar variations incident to the separate transactions involved, is pertinent to each case. Separate judgments were rendered and separate appeals taken from such judgments and from orders denying motions for new trial. All three appeals will be treated and disposed of in one opinion. All of the actions are vitally affected by the relationship which existed between appellant, Q. A. Knouse, and Mary Elizabeth Van Wagoner,

deceased (hereinafter referred to as deceased), respondent's testate, who died on October 20, 1931. The trial court found from abundant evidence which is uncontradicted, this relationship to be as follows:

" 'That prior to the 27th day of July, 1927, the said deceased, Mary Elizabeth Van Wagoner, was left a widow by her husband's death, and that ever since the death of said husband, and at all times referred to in the complaint, the defendant, Q. A. Knouse, acted as the agent, trustee, and confidential business advisor of said deceased, Mary Elizabeth Van Wagoner. In such capacity said defendant invested all of her money for her and collected all interest and income from such investments for her and deposited the same in his own personal bank account and paid the said deceased interest on her investments, such as mortgages and deeds of trust, with his own personal checks, so that said deceased never knew when said interest was paid to her, whether the interest paid to her was paid by the mortgagors, or paid by the said defendant, although the said payments were represented to be paid by the mortgagors. That such mortgage or trust deed loans as defendant made for the deceased, he customarily made in his name, and thereafter assigned them to the deceased. That a number of such loans were building loans, wherein the deceased would pay over to defendant the entire amount of said loan, and he would put the same in his own bank account and pay the same out to the mortgagor as the building progressed. That on said mortgage and trust deed loans defendant collected from the borrower a 3 per cent commission and kept it, and required the said borrower to purchase insurance on the building so mortgaged through him as an agent, and on which he collected and retained a commission.'

"In action L. A. No. 16044, appellant, Q. A. Knouse, as plaintiff sued respondent as defendant on a promissory note in the sum of $2,012, alleged to have been executed by deceased for a valuable consideration. Appellant, as the foregoing finding indicates, was the trusted and confidential agent of deceased. On July 28, 1927, he, on a building loan arrangement, loaned $5,000 to Ripley H. and Chloe Hope, husband and wife, which was evidenced by a promissory note secured by a mortgage, both of which instruments were made out to appellant as payee and mortgagee, respectively. There

was, however, nothing irregular in the fact that the note and mortgage were made in Knouse's favor rather than in favor of deceased, because the evidence also shows without contradiction that Knouse handled all of deceased's business in that manner, even to the point of carrying certain funds of deceased in his own bank account. In the instant transaction, however, Knouse testified that the mortgage was recorded and returned to him on August 15, 1927, and that some time between then and August 30, 1927, he transferred the note to deceased by endorsing the same over to her, but without recourse on him. He claimed further that he executed an acknowledged assignment of the mortgage to deceased. None was ever found, nor was one ever recorded. It also appears from the evidence that in spite of the alleged delivery of the note from appellant to deceased that all subsequent payments of interest on the note were endorsed thereon by Knouse in his own handwriting. Shortly after the full $5,000 had been loaned to the Hopes, the successors in interest of the Hopes defaulted in payment of interest, and within approximately a year thereafter appellant in his own name brought an action to foreclose the mortgage, alleging in the foreclosure complaint that he was the owner and holder of the note and mortgage. The foreclosure action was brought on December 2, 1929. In the meantime, however, appellant continued to pay interest to deceased on the Hope note until on or about July 6, 1931, on which later date he presented to deceased an account which had appended to it a promissory note in the sum of $2,012, payable to appellant within six months thereafter, which he caused deceased to sign, and which she did sign on that date.

"The instant action is upon said promissory note, the appellant contending that it represented interest payments which had been made to deceased after default on the Hope note, as well as money which he had advanced for payment of taxes for the property securing the Hope mortgage. On this particular subject of advancements, the trial court found on adequate evidence, '. . . That not over $1,200.00 in interest had been so advanced, nor had over $420.00 of advances for taxes on said mortgaged property ever been made by plaintiff. That plaintiff . . . obtained a note from said decedent for approximately $500.00 in

excess of said interest payments and alleged advances for taxes.'

"The trial court also found upon sufficient evidence, 'That all said payments were made on said Hope mortgage by plaintiff voluntarily, and not at the request or with the knowledge of said deceased. That at the time said plaintiff obtained the note sued on in this action he claimed the ownership of said Hope mortgage and was foreclosing the same in his own name as owner and without the knowledge of said deceased. That there was, therefore, no consideration whatever for the execution of said note.'

"There was much evidence introduced as to the physical and mental condition of deceased, and based upon this evidence, the court found as follows: 'That at the time said purported account and promissory note were presented to said Mary Elizabeth Van Wagoner by plaintiff, she was an aged woman of about 65 years, and was suffering from a fibroid tumor in the uterus from which she had been suffering for many years, and was also suffering from anemia in an advanced stage, and from dropsy, and was mentally incompetent to transact any business.'

"In action L. A. No. 16045, the evidence shows that on September 4, 1930, appellant, Q. A. Knouse, and his wife, M. L. Knouse, loaned $4,200 to Miles W. Heimbecher and Mildred A. Heimbecher; that subsequently the Knouses assigned the Heimbecher note to deceased and guaranteed its payment. The Heimbecher note was defaulted, and respondent, as executor of the estate of deceased, sued appellant and his wife on their guaranty. In defense they pleaded a release which was executed by deceased on May 1, 1931, approximately five months prior to her death. The court found from ample evidence that the deceased was incompetent when she executed the release and that there was no consideration for the same. These findings were based on the same evidence as were the findings in the Hope note case, with additional evidence as to the mental and physical condition of deceased on the date of the execution of the alleged release.

"In action L. A. No. 15549, respondent, as executor of the estate of deceased, sued for a rescission of the Hope mortgage transaction, alleging the facts which we have already recounted in our treatment of action L. A. No. 16044, and

additional facts accounting for his failure to bring the action for rescission at an earlier date by reason of negotiations for compromise which were had between respondent and appellant from the time respondent first learned the facts with reference to the said Hope transaction up to the time of the bringing of the action. Appellant raises no question of laches, however, and relies primarily upon his separate defense to said action, pleaded as follows: 'That shortly prior to the death of said Mary Elizabeth Van Wagoner, (she) . . . for a valuable consideration released and discharged this defendant from any and all claims of every kind, nature and description whatsoever, by reason whereof plaintiff does not now have any claim against this defendant.' The pleading referred to two releases, the first executed on January 4, 1930, and the second on May 1, 1931. It will be recalled that the Heimbecher transaction took place between the two dates on which the releases were executed. With reference to this defense of release, the trial court found: 'That it is not true that shortly prior to the death of said Mary Elizabeth Van Wagoner, she, for a valuable consideration, or otherwise, or at all, released or discharged the defendant from any and all claims of every kind, nature and description whatsoever. In this connection, the court finds that the two purported releases, introduced into evidence by defendant, signed by said deceased . . . and purporting to release said defendant from any and all liability to her, were obtained through and by the undue influence of the defendant, who at the time said purported releases were signed by said deceased, and for many years prior thereto had been her confidential agent, trustee and financial advisor . . . that at the time said purported releases were signed by said deceased that she was wholly incompetent mentally by reason of illness and old age, to transact any business whatever and that defendant in obtaining said releases gave to said deceased no consideration whatever therefor, and that said releases were fraudulently obtained by said defendant.'

"The trial court also found as facts: 'That in the spring of 1932, plaintiff became suspicious of defendant and demanded delivery of any notes and mortgages in his possession belonging to the estate of said deceased. That even then defendant did not disclose that he had brought suit to foreclose said Hope mortgage as his own property and in his

own name, but stated that plaintiff might have some trouble with the Hope mortgage, but that it would be all right. That it was not until the month of May, 1932, that defendant [plaintiff] discovered that said foreclosure suit was pending in the name of the defendant, and that the mortgagors had paid interest thereon for only fifteen months.

" 'That thereafter plaintiff and his attorney made a complete and thorough investigation of the handling of deceased's affairs by the defendant, and particularly the said Hope mortgage transaction. That after the plaintiff discovered that defendant had brought suit to foreclose the said Hope mortgage as his own property and in his own name, and that the prosecution of said suit had been grossly neglected for more than two years, the defendant then offered to turn the prosecution of said suit over to plaintiff, and to substitute the plaintiff herein as plaintiff in said foreclosure action.

" 'That after a full investigation of the entire transaction and on or about the 5th day of July, 1932, the plaintiff in writing notified defendant that he refused to accept the said Hope note and mortgage, or to allow substitution of himself for the said defendant, and did on said date rescind the purported assignment thereof to said deceased, and did thereupon tender back to defendant the said note and mortgage, and demand the payment to the plaintiff of the sum of $5,000 and interest thereon from the date of the payment thereof to said defendant by said deceased, less such sums of money as might have been received by said deceased from the defendant as interest thereon. That no objection was made to the form of said notice of rescission by defendant or said tender, but said defendant refused to pay the plaintiff said sum of $5,000, and interest as demanded. That between the 5th day of July, 1932, and the date of filing of said action, the plaintiff and defendant negotiated from time to time in an effort to effect a compromise of said claim or demand of the plaintiff, but such negotiations were finally abandoned, shortly before this action was commenced.'

"With reference to the physical and mental condition of deceased, appellant himself testified:

" 'Q. Didn't you know that, in July of 1931, this woman didn't have long to live? A. I didn't know how long she would live. Q. You thought she was going to die shortly, didn't you? A. Well, I thought that for five or six years

before she died. I didn't think, she would live so awfully long. Q. You had the feeling all the time, for four or five years, that she was approaching the end, before she did die? A. Yes, sir.'

"A Dr. Nimocks, physician to deceased and her lifelong friend, testified in part: 'Well, she was a woman about 72, and she was very much overweight. She was anemic. . . . She had known that she had had a fibroid tumor for 25 years and . . . had hemorrhaged periodically most of the time since them. Sometimes she would go for months without any severe hemorrhage and then again she would just hemorrhage a little, and then again, sometimes she would have quite a severe hemorrhage . . . two years before I took care of her, she was very sick, and they had had a consultation of physicians . . . she was in the hospital. And she had a heart lesion. She had a regurgitation which was caused undoubtedly from weakened condition due to the hemorrhage. She also had some myocarditis, not so severe at that time, but it grew more severe as she continued hemorrhaging, her health was gradually failing as it would from repeated hemorrhages . . . in November, 1930. Her hemoglobin at that time was 35 per cent, and her red cells were about three million, and her color index was only 3 per cent—, or rather, three-tenths of a per cent. . . . In fact, she couldn't walk through the house without getting short of breath, and if she went upstairs, she had to stop and rest. . . . I advised that she not be allowed to come downstairs. . . . And I tried then to have her take iron hypodermically, but she objected to it. She had quite a fear of the hypodermic needle, so I gave her a tonic of iron and other blood builders. . . . She was a very difficult patient, because she would refuse to take medicine. She would take a few doses and then refuse to take it any more, and from that time on, she gradually grew weaker and failed. I think about the 12th of April, that was the last time she was ever out of the house. . . . And the first of July, she went upstairs and was never downstairs again after that. . . . She should have been in bed, . . . but she refused to do that, and insisted upon being up, . . . in the month of February (1931) she had a much more severe hemorrhage than she had been having, and was in bed for ten days and was very anemic. . . . She had quite a dropsical condition . . . in the legs . . . all that last summer . . . there was

considerable dropsy in the abdomen,—considerable fluid in the abdomen. . . . It lowers all the processes of the body, and the mentality, as well as the rest. She used to say to me, when I would ask her about the hemorrhage, ''Oh, I can't remember. Don't remember whether I hemorrhaged yesterday or not. I can't remember about it.'' She used to put her hand out like this, (illustrating) and say, ''I can't remember, I am getting so I can't remember.''

'' 'Q. That condition that you observed, regarding her statement as to failing memory,—how many months before that did you notice that condition? A. Well, more or less from the time of the call I made in November, 1930, but it grew more so, very much more so, along about April, and from then on. Q. Was there any decided breakdown of Mrs. Van Wagoner after April, as the days went by, or the weeks? A. No; not decided. It was just a gradual decline, and she gradually grew weaker, and had more labored breathing on exertion, due to the lack of blood. . . . No, I would not say she was capable of reasoning and thinking after that. (April 12, 1931.) She couldn't keep her mind on anything any length of time. . . . She was very careless about the hemorrhage, and about leaving the evidences of it about the house. . . . Q. I will ask you if, in your opinion, on the first day of May, 1931,—whether she was capable of transacting business and knowing the purport of a business transaction? A. I don't think so.'

''Dr. Rufus S. David testified in part: 'Q. What is the effect upon the mentality of a patient who has a blood count of . . . 28 hemoglobin? A. It all depends on the age of the patient. . . . With a woman of her age, you couldn't expect to get any coherent answer . . . that you can depend upon. . . . I told her she should stay absolutely quiet in bed, and with the foot of the bed elevated . . . and she was out of bed, trying to move around. . . . Q. In your opinion, at that time, could she take care of business matters? A. No. Q. Or analyze them, or knew what was being done? A. No. . . . the woman must have been in that condition a year or more,—I would say at least a year.' There was other evidence to the same effect.

''It is apparent that the finding, with reference to the incompetency of the deceased at the time she executed the note in the first action, and the releases, which were pleaded

as defenses in the latter two, is amply sustained by the evidence. It follows that we could not, even were we disposed to do so, disturb this finding on appeal. (2 Cal. Jur. p. 921, paragraph 543; *Andrews* v. *Reidy*, 131 Cal. App. 334, 336 [21 Pac. (2d) 457].) We find no other points on appeal which merit specific attention.''

The judgments in all three cases are respectively affirmed, and since there is no appeal authorized from an order denying motion for a new trial on facts such as these, the appeal in each case from such order is dismissed.

Edmonds, J., Thompson, J., Shenk, J., Langdon, J., Waste, C. J., and Seawell, J., concurred.