[S.F. No. 24307. June 17, 1982.]

In re the Marriage of JACQUELYN C. and JAMES O. FLAHERTY.
JAMES O. FLAHERTY, Appellant, v.
JACQUELYN C. FLAHERTY, Respondent.

638

**COUNSEL**

Jay-Allen Eisen, Rothschild & Eisen, Michael Rothschild, Anthony S. Dick, Roberta Ranstrom and Wilson Curle for Appellant.

Douglas R. Page as Amicus Curiae on behalf of Appellant.

Lee A. Lopez and Michael J. Hamilton for Respondent.

Jonathan Milberg as Amicus Curiae.

---

## OPINION

**BIRD, C. J.**—Did the trial court abuse its discretion under the particular facts of this case when it refused to order a mother, who testified she worked part time but could obtain full-time work if she chose, to pay child support and ordered both parents to pay the child's transportation costs? Was an appeal based on this issue frivolous? What procedures should the Courts of Appeal follow before fining or criticizing attorneys for prosecuting frivolous appeals? (See Code Civ. Proc., § 907; Cal. Rules of Court, rule 26 (a).)

### I.

Jacquelyn and James Flaherty were married in 1974. Their child, Melissa (Missy), was born in January of 1975. The couple separated in 1976, and Jacquelyn filed for divorce in Kentucky. She was awarded temporary custody of Melissa. The Kentucky divorce proceedings were never completed.

Jacquelyn and Melissa moved to California in 1977. In early 1978, Jacquelyn left Melissa in the care of Norma Chambers, Jacquelyn's mother. Later that year, the Chambers filed for guardianship of Melissa. James then moved to California and began living with the Chambers and Melissa. At this point, the guardianship petition was withdrawn.

On December 1, 1978, James filed a petition in Shasta County Superior Court for dissolution of his marriage to Jacquelyn. He asked for the custody of Melissa and child support from Jacquelyn. The court awarded temporary custody to James and reasonable visitation rights to Jacquelyn. Thereafter, James moved back to Kentucky with Melissa.

In October of 1979, while the dissolution action was still pending, Jacquelyn asked the court to modify its temporary order and award joint custody to each of the parents. The court denied the request for

joint custody in December of 1979 but modified the visitation order to provide that Melissa could visit Jacquelyn for approximately four months each year, including the Christmas and summer vacations. The trial court ordered Jacquelyn to pay the transportation cost of Melissa's trips to visit her and ordered James to pay for the return trips.

Jacquelyn and James filed financial declarations with the court. James' declaration stated that his gross monthly income was $990, his net monthly income $682.52. His monthly expenses were $707, including $42 a month toward the costs of transporting Melissa home after her visits to her mother. Jacquelyn reported a gross monthly income of $398, a net monthly income of $373, and monthly expenses of $580. In her attached declaration, Jacquelyn stated that she would spend as much money on Melissa during her four months of visitation as James spent during the rest of the year.

At a hearing on Jacquelyn's change of custody motion, she testified that she could work full time if she wished. She said, "The only reason I am on part time at work is because I asked for it. You know, at the time if I needed to have more money to support Missy I could be put on full time anytime."

In April of 1980, the court entered an interlocutory decree dissolving the marriage. The prior orders awarding custody to James, granting Jacquelyn specified visitation rights, and dividing the transportation costs between the parents were incorporated into the decree. James' request for child support was denied.

James appealed two issues, the denial of child support and the order dividing the transporation costs. The Court of Appeal affirmed the trial court judgment and fined James' attorney $500 for the filing of a frivolous appeal. (See Code Civ. Proc., § 907; Cal. Rules of Court, rule 26(a); see *post* at p. 646.) The court chastized the attorney for burdening the court with a patently unmeritorious appeal and certified the opinion for publication.

James' petition for a hearing before this court was granted. The grant of the petition for hearing nullified the penalty, vacated the Court of Appeal opinion, and required this court to decide the appeal as if it were originally taken here. (*Menchaca v. Helms Bakeries, Inc.* (1968) 68 Cal.2d 535, 541, fn. 1 [67 Cal.Rptr. 775, 439 P.2d 903]; *Knouse v. Nimocks* (1937) 8 Cal.2d 482, 483–484 [66 P.2d 438]; see 6 Witkin,

Cal. Procedure (2d ed. 1971) Appeal, § 617, p. 4540.) However, for future guidance, this opinion will examine the superseded penalty and the procedure by which it was imposed, as well as the merits of the appeal.

## II.

James challenges the trial court order denying his request for child support and requiring him to share the transportation costs associated with Melissa's visits to her mother. He argues that the trial court improperly failed to consider Jacquelyn's earning *capacity*, were she to accept full-time employment. He claims that the denial of child support was based on a statute which unconstitutionally distinguishes between the child support obligations of a mother and of a father.

It has long been the rule in this state that a parent's earning capacity may be considered in determining spousal and child support. (See, e.g., *Eidenmuller v. Eidenmuller* (1869) 37 Cal. 364, 366; *Webber v. Webber* (1948) 33 Cal.2d 153, 160 [199 P.2d 934].) As Justice Tobriner stated over 20 years ago, "the cases have frequently and uniformly held that the court may base its decision on the husband's ability to earn, rather than his current earnings." (*Meagher v. Meagher* (1961) 190 Cal.App.2d 62, 64 [11 Cal.Rptr. 650]; see also *Pencovic v. Pencovic* (1955) 45 Cal.2d 97, 100-102 [287 P.2d 501]; *In re Marriage of Chala* (1979) 92 Cal.App.3d 996, 999 [155 Cal.Rptr. 605].)

James contends that the trial court disregarded this well-established rule because it relied on a sex-biased statute, former Civil Code section 196.[1] Former section 196 provided, "The parent entitled to the custody of a child must give him support and education suitable to his circumstances. If the support and education which the father of a child is able to give are inadequate, the mother must assist him to the extent of her ability." The clear implication of the statute was that the father had a greater support obligation than the mother, who was required to assist him only if his resources were inadequate.

Section 196 was first enacted in 1872. Some courts have interpreted the statute as placing the primary duty of support on the father with the mother's duty secondary to his. (*Stargell v. Stargell* (1968) 263

---

[1]Civil Code section 196 was repealed and reenacted with revisions in 1980. (Stats. 1980, ch. 1341, §§ 1 and 2, p. 4744.) Section 196 currently provides: "The father and mother of a child have an equal responsibility to support and educate their child in the manner suitable to the child's circumstances, taking into consideration the respective earnings or earning capacities of the parents."

Cal.App.2d 504, 509-510 [69 Cal.Rptr. 715]; *Fox* v. *Industrial Acc. Com.* (1924) 194 Cal. 173, 181 [228 P. 38].) One commentator called this the "traditional interpretation of section 196." (Recent Cases, *Family Law* (1970) 7 San Diego L.Rev. 134, 137.)[2] Other courts, however, interpreted former section 196 in a sex-neutral manner, viewing it as placing the primary duty of support on the custodial parent, be that the mother or the father. (*In re Marriage of Barnert* (1978) 85 Cal.App.3d 413, 425-426 [149 Cal.Rptr. 616]; *Moore* v. *Moore* (1969) 274 Cal. App.2d 698, 701-703 [79 Cal.Rptr. 293]; *Levy* v. *Levy* (1966) 245 Cal. App.2d 341, 357-359 [53 Cal.Rptr. 790]; *Smith* v. *Workmen's Comp. App. Bd.* (1966) 245 Cal.App.2d 292, 297-298 [53 Cal.Rptr. 816].)

---

[2]So interpreted, former section 196 appears to state a sex-biased distinction that violates the state and federal Constitutions. "'To withstand scrutiny' under the Equal Protection Clause, "'classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives.'" *Califano* v. *Webster*, 430 U.S. 313, 316-317 (1977)." (*Orr* v. *Orr* (1979) 440 U.S. 268, 279 [59 L.Ed.2d 306, 319, 99 S.Ct. 1102].) In *Orr*, the Supreme Court found unconstitutional a state statute that authorized imposition of alimony obligations on men but not women. The court held that "the 'old notio[n]' that 'generally it is the man's primary responsibility to provide a home and its essentials,' can no longer justify a statute that discriminates on the basis of gender. 'No longer is the female destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas' ...." (*Id.*, at pp. 279-280 [59 L.Ed.2d at p. 319], quoting *Stanton v. Stanton* (1975) 421 U.S. 7, 10, 14-15 [43 L.Ed.2d 688, 692, 694-695; 95 S.Ct. 1373]; see also *Craig* v. *Boren* (1976) 429 U.S. 190, 198 [50 L.Ed.2d 397, 407, 97 S.Ct. 451].)

The Supreme Court also rejected the contention that the statute served legitimate state interests either by eliminating the need for burdensome hearings as to need or by compensating women for past discrimination. First, individual hearings were held in any event, so the statute did not reduce the administrative burden. (*Orr v. Orr, supra*, 440 U.S. at p. 281 [59 L.Ed.2d at p. 320].) Second, the statute helped only those financially stable women who would otherwise have been obligated to pay spousal support. It thus would not serve to compensate needy women for past discrimination. (*Id.*, at p. 282 [59 L.Ed.2d at p. 321].)

Virtually identical considerations would apply to a statute placing the primary duty of child support on fathers. (See Hull, *Sex Discrimination and the Equal Protection Clause: An Analysis of Kahn v. Shevin and Orr v. Orr* (1979) 30 Syracuse L.Rev. 639, 672 [*Orr* holding will extend to sex-biased child support statutes].) First, outmoded beliefs that it is the man's responsibility to support the family clearly would not be sufficient to justify such a sex-based discrimination. Second, a sex-neutral child support statute would impose no greater burden on the judicial system, since individual determinations of financial resources and needs are already part of the procedure for awarding child support.

Third, a statute which relieves women of an equal responsibility for the support of their children benefits only those women who otherwise would be ordered to pay child support, the most financially secure women. In addition, child support differs from the spousal support at issue in *Orr* in that it is purely for the benefit of the child. It does not reflect the past relationship between the parents, and should be based only on the

These courts attempted to reconcile former section 196 with case law and with other sections of the Civil Code which impose a duty of support on both parents. (See, e.g., *Nunes* v. *Nunes* (1964) 62 Cal.2d 33, 39 [41 Cal.Rptr. 5, 396 P.2d 37]; Civ. Code, §§ 4357, 4700; see also former Civ. Code, §§ 137.2 and 139.) They read the statute as stating only half of the intended rule. The unstated half imposed a similar burden on the mother: if she were the custodial parent, the primary duty of support fell on her. Thus in *Smith* v. *Workmen's Comp. App. Bd., supra*, 245 Cal.App.2d 292, after noting that former section 196 had been a "source of confusion" (at p. 297), the court held that when the father has custody of a child, the father's duty of support is primary, while the mother's is secondary. (*Id.*, at p. 298.) Similarly, "[w]here custody of a child is awarded to the mother, the effect of section 196, as between the parents, absent any decree of court directing otherwise, is to shift the primary duty to support from the father to the mother . . . ." (*Ibid.*; see also *In re Marriage of Barnert, supra*, 85 Cal.App.3d at p. 425.)[3]

James asks this court (1) to assume that the trial court applied the sex-biased interpretation of former section 196 and (2) to find the statute unconstitutional. However, it is not necessary to decide whether former section 196, as interpreted by some courts, was unconstitutional since James points to no evidence in the record to support his claim that the trial court applied a sex-biased standard.

■ The extent of child support in each case is within the discretion of the trial court. (*Armstrong* v. *Armstrong* (1976) 15 Cal.3d 942, 947 [126 Cal.Rptr. 805, 544 P.2d 941].) A trial court's ruling will be dis-

---

child's needs and the financial abilities of the parents. Concepts of redress for past discrimination thus have even less relevance in this situation than in *Orr*.

Finally, under the California Constitution sex-based distinctions are subject to strict scrutiny, a higher standard of review than that required by the federal Constitution. (*Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 17-20 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]; *Arp* v. *Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 393, 400 [138 Cal.Rptr. 293, 563 P.2d 849].) Thus, former section 196 would be evaluated under a stricter standard than that employed in *Orr*.

[3]These cases also read former section 196 as requiring the court to consider the resources of both parents in determining the proper level of support payments. Thus, the courts declined to look first to see whether the resources of the custodial parent were "inadequate," as suggested by the language of former section 196. Rather, they found that the test under that statute "is not an absolute test dependent upon whether the husband has any resources at all to furnish adequate support for his child, but a relative test in which the legitimate needs of the child must be whittled down or expanded in accordance with resources available from his parents." (*Levy* v. *Levy, supra*, 245 Cal.App.2d at p. 359; see *Moore* v. *Moore, supra*, 274 Cal.App.2d at pp. 701-703.)

turbed on appeal only if the record shows that the court has abused its discretion. (*Ibid.*) Neither party requested findings of fact from the trial court. ■ In the absence of such findings, an appellate court must presume that the facts would support the trial court's judgment. (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].) ■ Here, the record fails to support the conclusion that the trial court did *not* consider Jacquelyn's earning capacity. The record merely reflects the fact that the judge denied James' request for child support and ordered that the parents share the transportation costs.

Jacquelyn testified that she would spend as much on Melissa during her four months of visitation as James would spend during the rest of the year. She also asserted that Melissa was in need of clothing and medical care when she came to visit her mother. Since the record does not indicate how many hours Jacquelyn worked or the amount she would earn if she worked full time, this court must assume that the trial court considered all the evidence before it and properly concluded that Jacquelyn's resources were insufficient to enable her to provide for Melissa when she stayed with her mother and pay child support as well.[4] The record in this case thus fully supports the conclusion that the trial court reached its decision by applying a sex-neutral standard to the facts before it.

Since the record supports the trial court's rulings, no abuse of discretion has been shown. The judgment is affirmed.

### III.

The Court of Appeal rejected James' claim that the trial court abused its discretion in refusing to order Jacquelyn to pay child support and ordering him to share the transportation costs of Melissa's visits to her mother. Terming the appeal "utterly hopeless," with "no room for reasonable disagreement," the Court of Appeal imposed a $500 penalty on appellant's attorneys for prosecuting a frivolous appeal. (See Code Civ. Proc., § 907; Cal. Rules of Court, rule 26(a).) The court stated

---

[4]Appellant relies on *In re Marriage of Muldrow* (1976) 61 Cal.App.3d 327 [132 Cal.Rptr. 48]. However, the facts of that case are clearly distinguishable. In *Muldrow*, the Court of Appeal held that the trial court abused its discretion in refusing to order the mother to pay child support to the father, who had custody of their four children. The mother earned far more than the father, and the court concluded that "while both parents are in modest circumstances, the mother is enjoying a standard of living, relatively speaking, far superior to that of the children she has chosen to ignore." (*Id.*, at p. 333.) In this case, James earns more than Jacquelyn and their standards of living appear to be comparable. The *Muldrow* holding does not apply here.

that the appellate courts were facing "a multitude of meritless appeals," and could be saved from the resulting "morass of useless, purposeless make-work that threatens their very viability" only by forcing appellate counsel to exercise their professional responsibility to avoid prosecuting frivolous appeals. (See Bus. & Prof. Code, § 6068, subd. (c); rule 2-110, Rules Prof. Conduct of State Bar; ABA Code of Prof. Responsibility, DR 2-109, EC 7-4, EC 7-5, DR 7-102.) This opinion was certified for publication.

In a petition for rehearing before the Court of Appeal, appellant contended, without contradiction, that he had received no warning that the court might deem the appeal frivolous and impose a penalty. The sanction was not mentioned in the appellate settlement conference. Appellant had agreed to accept the result of the settlement conference—respondent rejected it—and had waived oral argument.

Code of Civil Procedure section 907 provides, "When it appears to the reviewing court that the appeal was frivolous or taken solely for delay, it may add to the costs on appeal such damages as may be just." California Rules of Court, rule 26(a) provides in pertinent part, "Where the appeal is frivolous or taken solely for the purpose of delay ... the reviewing court may impose upon offending attorneys or parties such penalties, including the withholding or imposing of costs, as the circumstances of the case and the discouragement of like conduct in the future may require." Neither the Rules of Court nor the statutes provide any guidance as to the definition of a frivolous appeal.

The appellate courts have in the past imposed sanctions on attorneys for the prosecution of frivolous appeals. (See, e.g., *Estate of Wempe* (1921) 185 Cal. 557, 564 [197 P. 949] [appeal had "not a semblance of merit" and the "only rational result could be delay"]; *Seidell* v. *Tuxedo Land Co.* (1932) 216 Cal. 165, 171 [13 P.2d 686] [appeal was "entirely barren of merit" and was "taken for delay merely"].) However, the published opinions fail to provide a clear definition of the concept "frivolous."[5] One commentator, calling the definitional problems "vexing," described judicial attempts to distinguish a frivolous appeal from a merely meritless appeal as "diverse and, on occasion, entertaining." (Kallay, *The dismissal of frivolous appeals by the California Courts of Appeal* (1979) 54 State Bar J. 92, 95; see also Comment, *The Vexa-*

---

[5]In addition, there appear to be no guidelines governing the appropriate *amount* of the fine that should be imposed in a given situation.

*tious Litigant* (1966) 54 Cal.L.Rev. 1769, 1794-1802; Note, *Penalties for Frivolous Appeals* (1929) 43 Harv.L.Rev. 113, 114 ["The frivolous appeal seems elusive of definition"].) Witkin notes that, "No useful method of classifying frivolous appeals suggests itself . . . ." (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 478, p. 4433.)

This lack of definition presents a problem both for attorneys and for the administration of justice. Counsel face the danger of being trapped between their obligation to their clients to diligently pursue any possibly meritorious claim, and their obligation to the judicial system to refrain from prosecuting frivolous claims. "[A]n attorney is often confronted with clashing obligations imposed by our system of justice. An attorney has an obligation not only to protect his client's interests but also to respect the legitimate interests of fellow members of the bar, the judiciary, and the administration of justice." (*Kirsh* v. *Duryea* (1978) 21 Cal.3d 303, 309 [146 Cal.Rptr. 218, 578 P.2d 935, 6 A.L.R. 4th 334].)

The courts have frequently disciplined attorneys who do not adequately protect their clients' interests. (See, e.g., *Lewis* v. *State Bar* (1981) 28 Cal.3d 683 [170 Cal.Rptr. 634, 621 P.2d 258].) In addition, the cases have rejected numerous attempts to hold attorneys liable for good faith decisions to assert their clients' claims. (*Goodman* v. *Kennedy* (1976) 18 Cal.3d 335, 344 [134 Cal.Rptr. 375, 556 P.2d 737]; *Weaver* v. *Superior Court* (1979) 95 Cal.App.3d 166, 182-183 [156 Cal. Rptr. 745]; *Umansky* v. *Urquhart* (1978) 84 Cal.App.3d 368, 372-373 [148 Cal.Rptr. 547]; *Norton* v. *Hines* (1975) 49 Cal.App.3d 917, 921-924 [123 Cal.Rptr. 237]; *Tool Research & Engineering Corp.* v. *Henigson* (1975) 46 Cal.App.3d 675 [120 Cal.Rptr. 291].)

The strong public policy in favor of the peaceful resolution of disputes in the courts requires that attorneys not be deterred from pursuing legal remedies because of a fear of personal liability. To decide otherwise "would inject undesirable self-protective reservations into the attorney's counselling role," and prevent counsel from devoting their entire energies to their clients' interests. (*Goodman* v. *Kennedy, supra*, 18 Cal.3d at p. 344.) "If the issue which the attorney is called upon to decide is fairly debatable, then under his oath of office, he is not only authorized but obligated to present and urge his client's claim upon the court." (*Murdock* v. *Gerth* (1944) 65 Cal.App.2d 170, 179 [150 P.2d 489]; see *Kirsch* v. *Duryea, supra*, 21 Cal.3d at p. 309; Bus. & Prof. Code, § 6068, subd. (c).)

However, the practice of penalizing frivolous appeals reflects a fear that irresponsible litigants may abuse their right of access to the judicial system. Although Witkin is unable to cull a definition of "frivolous" from the cases, he notes that "a few extreme examples demonstrate the necessity for a deterrent." (6 Witkin, Cal. Procedure, *supra*, p. 4433.) One cited example involved an appellant who filed 64 appeals, all involving his ex-wife and/or her attorney. (*Reber v. Beckloff* (1970) 6 Cal.App.3d 341, 342 [85 Cal.Rptr. 807].) Of the 64 cases, 5 were still pending, 32 had been dismissed and 25 resulted in affirmance of the trial court order. Only two resulted in reversals and both of these involved minor procedural issues. During the same period, the appellant applied for relief by extraordinary writ 19 times. All 19 were denied.

The difficulty is in striking a balance that will ensure both that indefensible conduct does not occur and that attorneys are not deterred from the vigorous assertion of clients' rights. (See Oberman, *Coping With Rising Caseload II: Defining The Frivolous Civil Appeal* (1981) 47 Brooklyn L.Rev. 1057, 1058.) In judging whether an attorney has violated a duty to a client in choosing not to assert a claim, this court has granted the attorney latitude to make reasonable choices among competing options. "[I]t is not sufficient to show that some or many prudent attorneys would not have made the mistake. The attorney's choice to honor the public obligation [to refrain from prosecuting meritless claims] must be shown to have been so manifestly erroneous that no prudent attorney would have done so." (*Kirsh v. Duryea, supra,* 21 Cal.3d at p. 309.)

Similarly, counsel must have the freedom to file appeals on their clients' behalf without the fear that an appellate court will second-guess their reasonable decisions. "Free access to the courts is an important and valuable aspect of an effective system of jurisprudence, and a party possessing a colorable claim must be allowed to assert it without fear of suffering a penalty more severe than that typically imposed on defeated parties." (*Young v. Redman* (1976) 55 Cal.App.3d 827, 838 [128 Cal. Rptr. 86].)

Appellant suggests that it may not be possible to formulate a definition of frivolous that adequately balances these competing interests. He claims that any definition will be so vague as to unduly deter the exercise of the right to appeal. However, the courts of this state have not yet attempted to implement a uniform standard, carefully framed and

applied throughout the state. If such a standard is surrounded by procedural protections (see part IV, *post*) and sparingly applied, it can serve the important purpose of penalizing the most egregious conduct without deterring valid appellate claims.

The California cases discussing frivolous appeals provide a starting point for the development of a definition of frivolous. Those cases apply standards that fall into two general categories: subjective and objective. (See Cal. Civil Appellate Practice (Cont.Ed.Bar 1966) § 7.11, p. 234.) The subjective standard looks to the motives of the appellant and his or her counsel. Thus, in *Simon v. Bemis Bros. Bag Co.* (1955) 131 Cal. App.2d 378, 382 [280 P.2d 528], the court rejected a claim that an appeal was frivolous, noting that counsel presented his argument in a "courteous and gracious manner" and seemed to believe "fervently" that he might succeed on the merits. Similarly, the courts have frequently looked at the "good faith" of the appellant and have penalized appellants where the only purpose of the appeal was delay. (*Hall v. Murphy* (1960) 187 Cal.App.2d 296, 299 [9 Cal.Rptr. 547]; *Union M. Co. v. Chicago Bond. etc. Co.* (1918) 36 Cal.App. 585, 587 [172 P. 1113]; *Miller v. R. K. A. Management Corp.* (1979) 99 Cal.App.3d 460, 469-470 [160 Cal.Rptr. 164]; *In re Marriage of Schwander* (1978) 79 Cal. App.3d 1013, 1022 [145 Cal.Rptr. 325]; *In re Marriage of Millet* (1974) 41 Cal.App.3d 729, 732 [116 Cal.Rptr. 390].)

The objective standard looks at the merits of the appeal from a reasonable person's perspective. "The problem involved in determining whether the appeal is or is not frivolous is not whether [the attorney] acted in the honest belief he had grounds for appeal, but whether any reasonable person would agree that the point is totally and completely devoid of merit, and, therefore, frivolous." (*Estate of Walters* (1950) 99 Cal.App.2d 552, 558 [222 P.2d 100]; see also *Kunza v. Gaskell* (1979) 91 Cal.App.3d 201, 211 [154 Cal.Rptr. 101] ["As a reasonable person, he could not conceivably have anticipated a successful appeal"]; *Moore v. El Camino Hosp. Dist.* (1978) 78 Cal.App.3d 661, 664 [144 Cal. Rptr. 314]; *Guardianship of Pankey* (1974) 38 Cal.App.3d 919, 927 [113 Cal.Rptr. 858]. See *Anders v. California* (1967) 386 U.S. 738, 744 [18 L.Ed.2d 493, 498, 87 S.Ct. 1396] [an appeal is not frivolous if "any of the legal points [are] arguable on their merits"].)

The two standards are often used together, with one providing evidence of the other. Thus, the total lack of merit of an appeal is viewed as evidence that appellant must have intended it only for delay. (See,

e.g., *Miller* v. *R. K. A. Management Corp., supra*, 99 Cal.App.3d at pp. 469-470; *In re Marriage of Schwander, supra*, 79 Cal.App.3d at p. 1022; *Lawler* v. *Bannerman* (1970) 8 Cal.App.3d 893, 894 [87 Cal. Rptr. 756].)[6]

■ Both strands of this definition are relevant to the determination that an appeal is frivolous. An appeal taken for an improper motive represents a time-consuming and disruptive use of the judicial process. Similarly, an appeal taken despite the fact that no reasonable attorney could have thought it meritorious ties up judicial resources and diverts attention from the already burdensome volume of work at the appellate courts. Thus, an appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit. (See *Estate of Walters, supra*, 99 · Cal.App.2d at pp. 558-559.)

However, any definition must be read so as to avoid a serious chilling effect on the assertion of litigants' rights on appeal. Counsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win on appeal. An appeal that is simply without merit is *not* by definition frivolous and should not incur sanctions. Counsel should not be deterred from filing such appeals out of a fear of reprisals. Justice Kaus stated it well. In reviewing the dangers inherent in any attempt to define frivolous appeals, he said the courts cannot be "blind to the obvious: the borderline between a frivolous appeal and one which simply has no merit is vague indeed . . . . The difficulty of drawing the line simply points up an essential corollary to the power to dismiss frivolous appeals: that in all but the clearest cases it should not be used." (*People* v. *Sumner, supra*, 262 Cal.App.2d at p. 415.) The same may be said about the power to punish attorneys

---

[6]In *Crook* v. *Crook* (1960) 184 Cal.App.2d 745, 751 [7 Cal.Rptr. 892], the court proposed a third definition: "An appeal is 'frivolous' where the lack of merit is apparent from a mere glance at the record." However, the *Crook* court "apparently confus[ed] the penalty remedy with dismissal." (Comment, *The Vexatious Litigant, supra*, 54 Cal.L.Rev. 1769, 1795.) While a "mere glance" test might be appropriate when deciding whether to dismiss an appeal before allowing it to proceed to briefing and argument, it is of little value in determining whether to impose penalties at the close of a case. In addition, the test seems to focus improperly on the complexity of the record and briefing of the case, rather than the merits of the appeal. As Justice Kaus said in *People* v. *Sumner* (1968) 262 Cal.App.2d 409, 415 [69 Cal.Rptr. 15], "This test seems to make the determination depend on the legal acumen of the judge who does the glancing."

for prosecuting frivolous appeals: the punishment should be used most sparingly to deter only the most egregious conduct.

Viewed under this standard, James' appeal in this case cannot be deemed frivolous. There is no evidence of subjective bad faith. In contrast to most of the cases where sanctions have been imposed, James had nothing to gain from delay. The trial court ruling denied him support payments from Jacquelyn. The appeal kept open the possibility that he might receive those payments. It did not postpone his obligation to do anything except pay his share of Melissa's transportation costs.

On the merits, the appeal raised substantial questions of family law. James asserted that the trial court applied a sex-biased standard in determining that Jacquelyn should not pay child support. Although this court has affirmed the trial court, it was not unreasonable for James' counsel to think the issues were arguable. There are at least two sides to every legal dispute, and reasonable attorneys will often disagree about the merits of a particular case. Here, it cannot be said that "any reasonable person would agree that [James' argument] is totally and completely devoid of merit . . . ." (*Estate of Walters, supra,* 99 Cal.App.2d at p. 558.) This appeal was not frivolous.

## IV.

Vague definitions of what constitutes a frivolous appeal raise the danger that attorneys will be deterred from asserting valid claims out of a fear that they will incur court sanctions. This in turn will deprive their clients of their day in court. The lack of precise guidelines or of any procedural protections presents an additional danger that attorneys will be fined or severely criticized without notice or an opportunity to respond to the charges against them.

■ Due process requires that certain basic procedural protections be afforded before the state deprives an individual of property. (See *Wolff v. McDonnell* (1974) 418 U.S. 539, 557-558 [41 L.Ed.2d 935, 952, 94 S.Ct. 2963] ["The Court has consistently held that some kind of hearing is required before a person is finally deprived of his property interests"]; *Fuentes v. Shevin* (1972) 407 U.S. 67, 80-81 [32 L.Ed.2d 556, 569-570, 92 S.Ct. 1983]; *Mullane v. Central Hanover Tr. Co.* (1950) 339 U.S. 306, 313 [94 L.Ed. 865, 872-873, 70 S.Ct. 652]; *Blumenthal v. Superior Court* (1980) 103 Cal.App.3d 317, 320 [163 Cal. Rptr. 39]; *Hughes v. Neth* (1978) 80 Cal.App.3d 952, 954 [146 Cal.

Rptr. 37].) Appellant complains that in this case his attorney was fined $500 without notice of the possibility of a fine or any opportunity to respond to the Court of Appeal's charges. He asserts the same "simple and direct position" argued by the appellant in *Hughes* v. *Neth, supra*, at page 954. "Due process requires notice and hearing before a person's property may be forfeited." (*Ibid.*)

This claim has merit. Fundamental constitutional mandates require that the basic protections of due process be followed before an attorney is fined for prosecuting a frivolous appeal. (See *Blumenthal, supra*, 103 Cal.App.3d at p. 320, annulling award of discovery sanctions for lack of notice to attorney.)

The right to pursue one's chosen profession free from arbitrary state interference also is protected by the due process clauses of both the state and federal Constitutions. (Cal. Const., art. I, § 7; U.S. Const., 14th Amend.; *Endler* v. *Schutzbank* (1968) 68 Cal.2d 162, 169 [65 Cal.Rptr. 297, 436 P.2d 297]; *Sail'er Inn, Inc.* v. *Kirby, supra*, 5 Cal.3d at p. 17.) Although the state may discipline and regulate the qualifications of individuals employed in certain professions, it must do so within the limits of procedural due process. (*Endler, supra*, 68 Cal.2d at p. 170.) "The right to practice one's profession is sufficiently precious to surround it with a panoply of legal protections." (*Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 75 [64 Cal.Rptr. 785, 435 P.2d 553].)

Constitutional due process principles are offended by the summary imposition of sanctions by the appellate courts. It is true that the public criticism and fine at issue when a Court of Appeal reprimands an attorney for filing a frivolous appeal are lesser sanctions than the complete exclusion from the profession involved in *Endler* (Commissioner of Corporations threatened to revoke the license of any broker hiring plaintiff) or *Yakov* (Board of Medical Examiners revoked doctor's license). Nonetheless, they are sanctions that potentially could have a devastating impact on an attorney's ability to practice law. A public attack on an attorney's integrity and motives could seriously impair his or her ability to obtain employment and work effectively within the judical system. Witkin calls criticism in a published opinion a "severe sanction." (1 Witkin, Cal. Procedure (2d ed. 1970) Attorneys, § 189, p. 195.) "[F]undamental fairness requires that an individual be permitted to defend himself publicly against official charges, however in-

formal, which threaten to stain his personal and professional future." (*Endler, supra*, 68 Cal.2d at p. 180, citations omitted.)[7]

In addition, there is the danger that any disciplinary process that lacks careful procedural controls may be abused. In a similar situation, this court stressed the dangers that an unguided power to impose sanctions would present. (*Bauguess* v. *Paine* (1978) 22 Cal.3d 626 [150 Cal.Rptr. 461, 586 P.2d 942].) In *Bauguess*, the court held that in the absence of statutory authorization, a trial court may not impose attorney fees as a sanction against an attorney. "'Such power in the trial court, unfettered and unbridled, without appropriate safeguards and guidelines,'" could lead to the imposition of sanctions not for misconduct but for forceful advocacy. (*Id.*, at p. 639, quoting *Young* v. *Redman, supra*, 55 Cal.App.3d 827, 839; see also *Roadway Express, Inc.* v. *Piper* (1980) 447 U.S. 752, 767 [65 L.Ed.2d 488, 501-502, 100 S.Ct. 2455] [attorney fees should not be assessed as a sanction without fair notice and an opportunity for a hearing on the record].) The traditional judicial sanction against misconduct by attorneys, contempt, is surrounded by procedural safeguards. "Absent such safeguards, serious due process problems would result" and the "independence of the bar" might be imperiled. (*Bauguess, supra*, at p. 638.)[8]

The unguided discretion to impose fines currently vested in the Courts of Appeal raises the same concerns as the unlimited trial court power addressed in *Bauguess*. Without procedural protections, there is no control over the fairness of the process or the result. Indeed, in this case a concurring justice stated that he would not have imposed the penalty or published the opinion. He concluded that "there is nothing in this case to distinguish it from a hundred and more other meritless appeals which have been quietly dispatched by this court," calling it a "target selected apparently at random."

---

[7]Of course, an attorney takes the risk in every case that his or her legal work will be held up to public scrutiny. However, this risk should be distinguished from the risk of a public attack on the attorney's integrity or ethics. The briefing and argument on an appeal provide the attorney an opportunity to assert and defend a legal position. Personal attacks on attorneys should not be made without providing the lawyer an opportunity to defend his or her conduct.

[8]In 1981, the Legislature amended the Code of Civil Procedure to authorize trial courts to impose fines on a party or attorney, including attorney fees, as a sanction for actions taken in bad faith which are frivolous or cause unnecessary delay. (Code Civ. Proc., § 128.5, added by Stats. 1981, ch. 762, § 1, No. 5 Deering's Adv. Legis. Service, p. 878.) The statute provides that the sanctions cannot be imposed without affording notice and an opportunity to be heard, thus satisfying the due process concerns expressed in *Bauguess*.

Due process, fundamental fairness and the integrity of our judicial system all require that counsel be permitted to pursue their clients' interests with the confidence that they will not be singled out at random for sanctions. In proper cases, the imposition of penalties for prosecuting a frivolous appeal may be fair and may serve the useful purpose of deterring similar conduct. However, such sanctions should be imposed rarely and only if the mandates of procedural due process are obeyed.

## V.

Due process is a flexible concept, and must be tailored to the requirements of each particular situation. "'The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" (*Endler* v. *Schutzbank, supra,* 68 Cal.2d at p. 170, quoting *Cafeteria Workers* v. *McElroy* (1961) 367 U.S. 886, 895 [6 L.Ed.2d 1230, 1236, 81 S.Ct. 1743].) However, the rudiments of fair play include notice, an opportunity to respond, and a hearing. (See *Endler, supra,* at pp. 172, 180.) The appellate courts should exercise their statutory power to impose sanctions only after scrupulously observing the due process mandates set forth herein. Penalties for prosecuting frivolous appeals should not be imposed without giving fair warning, affording the attorney an opportunity to respond to the charge, and holding a hearing. Further, when imposing sanctions, the court should provide the attorney with a written statement of the reasons for the penalty. (Cf. Code Civ. Proc., § 128.5, requiring notice, an opportunity to be heard, and a written order reciting "in detail" the circumstances justifying the sanction.)

The trial court judgment is affirmed.

Mosk, J., Richardson, J., Kaus, J., and Broussard, J., concurred.

NEWMAN, J., Concurring and Dissenting.—I concur, but I do not agree that "holding a hearing" (*ante,* this page) is prerequisite to penalizing counsel for a frivolous appeal. The question of frivolousness can be raised at several stages; e.g., by motion to dismiss or at a settlement conference. When counsel knows the charge against him prior to briefing or oral argument, he may use either of those routes to reply. Sometimes, it is true, the court will not perceive the question until after briefing and argument have been completed; and notice may first reach counsel in the form of a declaration, in the court's decision or opinion, that sanctions are proposed. Even then, however, the decision or opinion

when merely filed is not final; and there is an opportunity to respond—
e.g., via petition for rehearing. The issues routinely would be legal, not
factual; and counsel's written argument normally would suffice. (See 2
Davis, Administrative Law Treatise (2d ed. 1979) § 10.9, p. 337: *"Does
Due Process Require Opportunity to Present Oral Argument?* [¶] The
answer is an unqualified no . . . ." Cf. his 1982 supp., § 10.1, p. 204:
"[T]oo many judges still fail to think in terms of possibly requiring no-
tice and opportunity for *informal* response." [Italics added.]) If for any
reason a mini-hearing seemed appropriate, Code of Civil Procedure sec-
tion 187 authorizes "any suitable process or mode of proceeding . . . ."

If a ruling on frivolousness of which counsel had no warning appears
in an opinion certified for publication, there is danger that the "severe
sanction" of criticism (*ante*, p. 652) will have effect before a petition for
rehearing can be filed or considered. I think that in that situation publi-
cation should be deferred until the opinion becomes final as to the court
filing it, with additional time to permit counsel to seek a stay from a re-
viewing court.