[No. G028450. Fourth Dist., Div. Three. July 16, 2002.]

MICHAEL DeROSE, Plaintiff and Respondent, v.
JOHN M. HEURLIN et al., Defendants and Appellants.

**COUNSEL**

Law Offices of John M. Heurlin, John M. Heurlin; Law Offices of Maria A. Caligiuri and Maria A. Caligiuri for Defendants and Appellants.

Day & Day, Alan C. Brown; Day, Day & Brown and Christopher J. Day for Plaintiff and Respondent.

**OPINION**

**FYBEL, J.—**

## INTRODUCTION

On our own motion we impose sanctions against Attorney John M. Heurlin and his law firm (Heurlin) for filing and prosecuting a frivolous appeal. We conclude Heurlin had improper motives in seeking (1) to delay the effects of an adverse judgment and (2) to cover up his mishandling of client trust funds and his dishonesty before the trial court. Heurlin compounded the deception at oral argument after notice of this court's consideration of sanctions against him. He was inexcusably unable or unwilling to respond forthrightly to our questions regarding his conduct.

### *Procedural History*

The case arises out of an attorney fees dispute between Heurlin and his former client, Michael DeRose. At the heart of the matter is Heurlin's handling of funds he agreed to hold in trust after DeRose's new attorneys obtained a settlement of a dental malpractice case on DeRose's behalf.

There was a series of motions, hearings, and rulings relating to DeRose's statutory offer to compromise, Heurlin's acceptance, and the parties' attempts to obtain entry of a Code of Civil Procedure section 998 judgment. (All further statutory references are to the Code of Civil Procedure unless otherwise stated.) The court entered a judgment in Heurlin's favor for the face amount of the compromise offer, but modified the judgment by interlineation, staying execution until Heurlin returned to DeRose "all remaining [settlement] funds" held in a client trust account.

The court's modification of the judgment was based on Heurlin's representations in the courtroom that he was holding the settlement monies in an account bearing interest for the State Bar. The court's judgment permitted Heurlin to retain the amount of the section 998 offer if he returned to DeRose the remainder of the trust monies he held. However, when Heurlin was served with notice of the judgment directing him to return the remaining funds, he sent a "gotcha" letter to DeRose's attorneys, advising them there were no funds in the account and he was thus free to execute on the judgment immediately. Heurlin's position was that he would take the money offered in settlement and keep all of the client trust funds to boot.

DeRose's motion for relief followed, as did Heurlin's motion to vacate the judgment and enter a new judgment. The court ultimately found any "agreement" was the result of mutual mistake, vacated the judgment, refused to

enter a new judgment, and sent the parties back to square one to resolve their dispute. Heurlin appealed, seeking to compel entry of a judgment requiring his former client to pay him the amount of the section 998 agreement while allowing him to keep all the money held in his client trust account.

After oral argument and this court's notice that it was considering sanctions against Heurlin, the parties settled and filed a stipulation for dismissal. We will dismiss the case pursuant to the stipulation. Nevertheless, we now describe the factual and procedural history and decide the sanctions issue.

### Sanctions

Heurlin followed a path of artifice and deceit with single-minded determination. Heurlin obtained control of his former client's settlement funds by giving his word in writing the money would be maintained in a trust account pending resolution of the fee dispute. In the midst of the controversy over the effect of an offer and acceptance under section 998, Heurlin transferred some or all of those funds to his general office account or elsewhere. Heurlin misled the trial court to conclude the full amount of the disputed money was safe in the client trust account. When his deception resulted in a court order for return of funds to the client, Heurlin attempted to render the order ineffective by advising the former client there were, in fact, no funds left. This indecent turnabout necessitated another round of hearings and a further waste of judicial resources.

Heurlin's conduct has been disgraceful. One hundred and fifty years ago, in notes prepared for a law lecture, Abraham Lincoln cautioned those pursuing a legal career, "Resolve to be honest at all events; and if, in your own judgment, you can not be an honest lawyer, resolve to be honest without being a lawyer. Choose some other occupation, rather than one in the choosing of which you do, in advance, consent to be a knave." (Lincoln, *Notes on the Practice of Law* in Abraham Lincoln: Speeches and Writings 1832-1858 (Fehrenbacher edit., Library of America 1989) p. 246.) Heurlin's failure to abide by this wisdom has harmed not only the parties to this case, but also those litigants waiting in line with nonfrivolous appeals and the taxpayers of California. For these reasons, as fully discussed below, we assess Heurlin sanctions for the costs of processing the appeal in the amount of $6,000 plus $123 for the court reporter's transcript, payable to the clerk of this court. We publish our opinion because the issue of integrity of lawyers is important to the bench, the bar, and the general public.

### FACTS

*General Background*

On October 12, 1998, Michael DeRose retained Heurlin to represent him in a dental malpractice action. After several weeks, DeRose decided to

change attorneys and directed Heurlin to transfer his files to the law firm of Day & Day. Acknowledging the discharge, Heurlin gave his former client notice that, pursuant to the terms of their written agreement, he was retaining a lien on DeRose's case "in the approximate sum of $22,797.00." He warned DeRose he intended to strictly enforce his rights, stating: "We will hold you to the letter of your agreement. We will be notifying [the dentist's] insurer of our lien, and will be sure to direct that our name appears on any settlement draft."

*Prelitigation Correspondence*

From December 1998 through February 1999, DeRose's new attorney, Christopher Day, repeatedly wrote to Heurlin, requesting him to forward copies of medical records and other documents and an itemization of his services and charges comprising the $22,797 lien. Receiving no response, Day finally suggested Heurlin's lack of cooperation constituted unprofessional conduct. On March 2, Heurlin retorted, "I plan on disseminating your little letter to as many referring counsel as possible, you diminutive shit." Advising Day to "educate [him]self" about attorney liens and the work product privilege, he closed with, "See you in Court."

Continuing his effort to obtain Heurlin's cooperation, Day wrote, "I do not want your work-product. You told me in our telephone conversation your $20,000 plus lien was incurred obtaining and reviewing medical records. Those records are not work-product. I take it from your letter you do not have any such records. [¶] My client has requested an itemization of your lien, and we again respectfully request that itemization. John, what in the world would prompt you to write a letter like that? All we wanted was the medical records you told me you reviewed. If you don't have any, all you had to do was say so." Heurlin contends that "[o]n December 23, 1998, Phil DeRose, Michael's father, picked up DeRose's file, including medical records. . . . In roughly April of 1999, Heurlin closed his skeleton file pending settlement and the satisfaction of his lien."

At the end of February 2000, Day wrote to Heurlin, advising him DeRose's case was about to settle, asking again for an itemization of time and charges on the case, and assuring Heurlin that Day & Day would "hold all disputed sums in trust pending resolution of your claim." Day sent yet another such request on March 6. On March 12, Heurlin forwarded his billings and a demand for $12,590.70, not the $22,797 lien amount he had first claimed. Confirming his intention to have his firm's name as a payee on the DeRose settlement check, Heurlin suggested the insurer issue a separate check for $12,590.70 to Heurlin's firm and remit the balance to DeRose and

Day. Heurlin advised Day it would be impossible "to negotiate the [settlement] check without my signature," and cautioned, "All funds will be held pending resolution of any disputed sum."

In his reply, Day stated, "It is unethical and grounds for discipline for you to delay disbursement of a client's money over a fee dispute with another lawyer. We presume that, when the check arrives, you will make arrangements to promptly endorse it as you are ethically required to do. Mr. DeRose's money will be disbursed to him. All *disputed* attorney's fees will be held in my trust account." (Original italics.) Heurlin replied, "[A]ll matters regarding our fee will be settled before Mr. DeRose sees a dime." Noting DeRose had signed an agreement to a lien on the proceeds of any recovery, Heurlin added, "[N]o draft [will] be endorsed by this firm until the precise amount of fees has been agreed-to and a draft payable to this firm tendered."

Day, reminding Heurlin that total attorney fees may not exceed those specified by statute (Bus. & Prof. Code, § 6146 [unconscionable fees]), again suggested the total amount of claimed fees should be placed in the trust account of a "neutral" individual, such as Heurlin's cocounsel, Evan Burge. Heurlin insisted no funds would be released unless his terms were met. His letter to Day stated, "As you, of all people know, I can be unabashedly aggressive in pursuing relief. Of course, then it might take Michael [DeRose] years to see his money." Heurlin also stated he had advised the insurer if it did not issue two checks, one to Heurlin's firm for the full amount of his demand, $12,590.70, and the balance to DeRose and Day, it should "pursue the interpleader option. Period." In closing, he told Day, "It would appear that formal proceedings will be required, so you may as well initiate them."

On March 21, the insurer issued a $75,000 settlement check payable to DeRose and the Heurlin and Day firms. Upon receipt, Day wrote to Heurlin, asking him to come to Day's office to endorse the check so DeRose's portion could be distributed to him. As for the remainder, Day again offered to hold the disputed attorney fees in trust and advised Heurlin, "[H]olding up Mr. DeRose's distribution over a dispute over fees is an ethical violation." Heurlin responded that, as "a secured lien holder," he would not voluntarily release his lien. He asked Day to provide information regarding the amount of the settlement, observing, "Obviously a settlement [of] $500,000 as opposed to $50,000.00 makes a significant difference in what constitutes a conscionable fee." Heurlin warned that Day was "irresponsibly denying [Heurlin's] reasonable claim for fees" and engaging in "unethical and actionable conduct," and advised Day to "take that admonition to heart."

On April 7, 2000, Day's partner, Brown, wrote to Heurlin, asking Heurlin once more to come to the law office and endorse the settlement check, and offering to place the disputed fees in Burge's trust account. Heurlin countered, "[M]y signature is not going on the check until we resolve the lien issue. You better get use [*sic*] to the idea that, if everyone wants to get paid, my lien will need to be paid." He concluded, "[C]all me when you have a check drawn for the amount of my fee lien in this case."

*Complaint; Cross-complaint; More Correspondence*

On April 17, 2000, DeRose filed a complaint against Heurlin. DeRose alleged causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, declaratory relief, and fraud, and raised issues including Heurlin's refusal to release the undisputed funds.

By a letter dated April 24, 2000, to Brown, Heurlin promised: "[Y]ou may execute the check, have Mr. DeRose execute the check, and I will deposit the check in *my* trust account, disbursing those funds to which I have no claim. *I will hold the disputed funds in my account pending a final determination of my rights to fees and costs.* Understand that such withholding must necessarily include collection costs, at least as incurred to the date of delivery of the draft." (Italics added.) Heurlin also gave notice of his intent to file an action for declaratory relief and breach of contract. The alleged amount in controversy was $12,590.70.

Brown, expressing concern about disbursing the funds to Heurlin, wrote, "[W]e will take you at your word that *all* fees and costs will be maintained in your client trust account pending resolution of this matter, and that you will promptly disburse [DeRose's] money. The endorsed draft will follow under separate cover." (Original italics.) On May 11, 2000, Day delivered the endorsed settlement draft with a letter instructing Heurlin, "Pursuant to your written promise, you are to immediately deposit the check in your client trust account, then disburse the sum of $40,408.68 to Mr. DeRose forthwith. You may withhold the amount of your lien for attorney's fees incurred in handling Mr. DeRose's case in the sum of $12,590.70. Please promptly remit the balance to my office."

Upon receiving the funds, Heurlin withheld $16,063.95 rather than $12,590.70 and, on May 11, sent a check for $58,936.05 to DeRose and Day. Eleven days later, Heurlin filed a cross-complaint against DeRose, Day, Brown, and Day & Day for indemnity, contribution, and declaratory relief. He sought noneconomic and punitive damages based on allegations of abuse

of process, tortious interference with contract, and intentional infliction of emotional distress.

Heurlin's handling of the settlement funds did not escape Day's notice. On May 17, he wrote to Heurlin, stating, "You have withheld more than your claimed [$12,590.70] lien on [DeRose's] case. [¶] . . . Please immediately return $3,473.25 to this office, as those monies belong to this firm. Your failure to do so will subject you to immediate civil action." The record contains no response from Heurlin.

*DeRose's First Statutory Offer to Compromise*

On May 24, 2000, DeRose conveyed to Heurlin a written section 998 offer to compromise. The offer stated in relevant part: "DeRose offers to allow judgment to be taken in his favor and against defendant John M. Heurlin for the sum of $5,000.00. Each party to bear their own costs." Heurlin did not respond.

Heurlin's expressions of antagonism toward Day and Brown continued unabated. In late May, he advised them this would not be a "courteous litigation." Brown responded, "[T]his office will remain courteous, reasonable and cooperative." Seeking Heurlin's reciprocating commitment to "a cordial and professional relationship," Brown enclosed in his letter a copy of the Code of Professionalism of the American Board of Trial Advocates (ABOTA), assuring Heurlin that Day & Day would "endeavor in every instance to handle this matter in accordance with that Code," and urging Heurlin to abide by and "hold us to this standard."

Heurlin immediately replied: "Let me ask: from what planet did you just arrive. It is my full intent to take judgment against Mr. DeRose on July 11, 2000 when my motion for summary judgment is heard, move for sanctions against you and your firm and do all in my power to see that you, and your firm, suffer to [the] full extent possible through a subsequent claim for malicious prosecution and, very likely, a malpractice action by your ex-client Mr. DeRose when he is presented with a fee demand for thousands of dollars." Heurlin concluded, "[Y]ou can take [the] ABOTA Code of Professionalism and shove it—where this case is concerned. When all is said and done, you, Mr. Day and Mr. DeRose will be so very, very sorry this course was pursued."

*DeRose's Second Statutory Offer to Compromise*

On June 28, 2000, Day sent Heurlin a second written section 998 offer to compromise. The offer stated, "[P]laintiff, Michael DeRose offers to settle

all claims against defendant JOHN M. HEURLIN for the sum of $7,000.00 payable to John Heurlin and the Law [O]ffices of John Huerlin [*sic*]. Each party to bear their own costs." In an accompanying letter, Day noted that with the exception of writing a single letter, Heurlin had performed no professional services for DeRose, yet the $7,000 offer constituted one-third of Day's fees. Day alluded to Heurlin's "unauthorized retention of an extra $3,473.25" (over and above Heurlin's disputed claimed fees of $12,590.70).

Heurlin replied the following day, demanding Day reconsider his position. In another stinging attack, he characterized Day as "a frightened Brier [*sic*] Rabbit who is now stuck to a tar baby of a case in which his *client* is on the hook for significant damages, attorney's fees, costs, etc.," and a "scared man looking for any way to avoid significant personal liability." (Original italics.)

*Heurlin's Acceptance of DeRose's Section 998 Offer*

On July 24, Heurlin mailed a written acceptance of DeRose's section 998 offer and a "proposed judgment filed in this matter." He advised Brown he had dismissed the cross-complaint. He asked Brown to "[p]lease have [DeRose] make his check for $7,000.00 payable to 'The Law Offices of John M. Heurlin,' " and offered to "waive interest on the judgment if payment is received before July 26, 2000." He did not mention or offer to return the $16,063.95 ostensibly retained in the trust account.

Brown immediately objected to Heurlin's "acceptance" of $23,063.95, i.e., $7,000 *plus* $16,063.95. By letter, Brown advised Heurlin that the trust money was DeRose's, not Heurlin's, to retain. He stated, "At present, you have $16,063.95 in your client trust account. You may now deduct the $7,000.00 and have a check delivered to this office for $9,063.95 payable to Day & Day as Trustees for Michael DeRose. If the check is received in our office by 5:00 p.m. on July 26, 2000, we will waive interest."

On July 26, Heurlin served DeRose with notice that judgment had been entered on July 25 against DeRose and in favor of Heurlin in the amount of $7,000. (As noted below, judgment had not been entered.) The next day, Heurlin advised Brown the $16,063.95 was "vested" in Heurlin and that DeRose owed him "a net judgment of $7,000.00," excluding costs. He advised Brown to provide him with a check in that amount lest Heurlin be required "to proceed by means of Writ of Execution and Levy." Incorrectly noting that judgment had been taken against DeRose the previous day, Heurlin opined the one judgment rule and doctrine of merger would bar DeRose from claiming any interest in the trust funds retained by Heurlin. He

taunted Brown, "[T]he action before Commissioner Palk is over. [¶] Deem your bluff called."

Day wrote to Heurlin the same day, stating: "Frankly, we are appalled at your most recent letter. [¶] The funds you hold are *in trust*, and disputed. You are a trustee, and they are not 'vested in you.' If you misinterpreted the C.C.P. § 998 offer, . . . just let us know and we'll proceed with arbitration. You may retain $7,000.00 of the money *held in trust*, and return the rest to [DeRose], or you can name five (5) arbitrators and we'll proceed. [¶] You are further advised that your tactics and actions are clearly in bad-faith and frivolous, and we will seek our attorney's fees and costs incurred should you keep this up." (Original italics.) Heurlin did not respond.

On August 1, Brown again wrote to Heurlin, stating that the funds Heurlin held were in trust. Brown repeated his accusation that Heurlin had deliberately misinterpreted the section 998 offer. He stated, "Instead [of deducting $7,000 from the trust account], you took the $16,063.95 and then demanded an additional $7,000.00. This was never part of our offer." Brown again told Heurlin, "[Y]ou may retain $7,000.00 of the money *held in trust*, and return the rest [$9,063.95] to [DeRose], or you can name five (5) arbitrators and we'll proceed with arbitration of the matter at J.A.M.S." (Original italics.) Finally, Brown advised Heurlin that if he declined to return the money or cooperate in their ongoing dispute over whether the case should be arbitrated, Day & Day would "file motions to set aside [Heurlin's] fraudulent documents, with a request for attorney's fees and costs."

*DeRose's Motion to Vacate*

One week passed with no response from Heurlin. On August 8, 2000, DeRose filed a motion to strike Heurlin's acceptance of the section 998 offer and the notice of entry of judgment and to vacate the judgment. The stated statutory ground for the motion was section 436 (authorizing court to "[s]trike out any irrelevant, false, or improper matter inserted in any pleading"). DeRose argued Heurlin filed a fraudulent acceptance and obtained a fraudulent judgment while knowing full well he was misconstruing the section 998 offer. DeRose specifically noted, "There was no ambiguity about plaintiff's intentions; we sent a letter to Heurlin making it crystal clear we were offering him $7,000.00 of the $16,063.95 held in trust, or 'one-third of our fee.'" DeRose also asserted section 473 (judgment taken against party through his or her mistake) and section 663 (setting aside judgment due to incorrect or erroneous basis, not consistent with or supported by facts) as grounds for relief.

*Heurlin's Petition for Writ of Mandate*

Three days after DeRose filed his motion for relief, Heurlin petitioned this court for a writ of mandate. He alleged the trial court had refused to enter judgment pursuant to section 998, instead returning to him his section 998 acceptance with a yellow Post-it note, stating, "It isn't clear if this acceptance settles the complaint and cross-complaint or just the cross-complaint (or part of cross-complaint)." He contended the court had a mandatory, nondiscretionary duty to enter the judgment precisely as submitted, without questioning it, and he asked this court to direct the trial court to perform that supposed duty. The petition for writ was peremptorily denied by order filed August 24. (*Heurlin v. Superior Court* (Aug. 24, 2000, G027753).)

*Hearing of August 29*

On August 29, 2000, the court explained the judgment had not been entered because Heurlin failed to indicate whether he was dismissing all named parties from his cross-complaint. Heurlin assured the court the other parties had been dismissed and the judgment should be entered. The court inquired whether the section 998 offer was for settlement of the whole case, including the cross-complaint, and Heurlin responded, "It is as to the entire action."

Brown then explained to the court that Heurlin was claiming entitlement to in excess of $23,000, when the statutory offer was for only $7,000. Brown argued that by taking $16,063.95 and demanding an additional $7,000, Heurlin had made a counteroffer rejecting the section 998 offer, there was therefore no agreement to settle, and the matter should proceed to arbitration with a court-appointed arbitrator. Heurlin responded it would be a waste of time and money to arbitrate because he would just "file the offer and acceptance with the arbitrator," giving rise to a "statutory mandatory non-discretionary duty to issue an award in [Heurlin's] favor in the sum of 7,000 bucks." Heurlin contended DeRose actually owed him more than $48,000, but Heurlin had decided to accept $7,000 plus his "statutory lien" because the case was "too big a pain."

The court indicated its uncertainty about Heurlin's line of reasoning and repeatedly asked him where the $16,000 he was holding fit into the picture. After unsuccessfully attempting to explain his position to the court's satisfaction, Heurlin challenged the court to simply enter the $7,000 judgment and see what happened. He argued, "Enter the judgment that I gave you, and let's find out what the effect of that judgment is. Enter the judgment exactly as it was prepared, exactly as it was offered, and let's find out what the legal effect of that is. [¶] I am absolutely sure and Mr. Brown knows that if you

enter the judgment that was offered, that that 16,000 is *mine*, and Mr. DeRose owes me $7,000." (Italics added.)

The court persisted, telling Heurlin, "I don't see where you get the additional [money] if you're agreeing to accept [$7,000]. That's where you've lost me."

*Minute Order of September 5 and Proposed Judgment*

On September 5, 2000, the court issued its minute order denying DeRose's motion to strike Heurlin's acceptance of the section 998 offer. In pertinent part, the order further stated: "Heurlin's cross complaint includes a cause of action for declaratory relief as to fees and costs owed to him by DeRose. . . . Heurlin represented at the hearing . . . that the $7,000 would dispose of *both the complaint and the cross complaint.* (The complaint by DeRose addresses settlement funds held by Heurlin.) [¶] . . . [¶] Judgment to be entered for John M. Heurlin and Law Offices of John Heurlin and against Michael DeRose in the sum of $7000. Said $7000 is the total sum to be retained by Heurlin for legal services, including costs, rendered by Heurlin. Any and all funds held by Heurlin in excess of the $7000 are to be forwarded to DeRose pursuant to the settlement of the complaint and cross complaint. [¶] Judgment to be prepared by DeRose. . . ." (Original italics.)

DeRose prepared and served the proposed judgment. As relevant here, it stated, "Pursuant to Heurlin's acceptance of DeRose's C.C.P. § 998 Offer, judgment to be entered for John M. Heurlin and against Michael DeRose in the sum of $7,000.00. Said $7,000.00 is the total sum to be retained by Heurlin for legal services, including costs, rendered by Heurlin, and is the total amount due Heurlin on the complaint and cross-complaint. Any and all funds held by Heurlin in excess of the $7,000.00 are to be forwarded to DeRose pursuant to the settlement of the complaint and cross complaint [*a*]*s Heurlin was holding $16,063.95 of disputed funds in his client trust account.* [¶] IT IS ORDERED that [DeRose] have and recover from defendants JOHN M. HEURLIN and LAW OFFICES OF JOHN M. HEURLIN the sum of $9,063.95, plus interest at the legal rate until paid." (Italics added.)

*Heurlin's Objection to Proposed Judgment, Motion to Vacate Judgment and Proposed Judgment*

Heurlin objected to the proposed judgment on the grounds it was incorrectly drafted, included language inconsistent with and in addition to the exact words of the offer and acceptance, materially changed the parties' substantive rights under the agreement, and violated Heurlin's rights under

contract and substantive due process. He contended the court had rewritten the compromise offer and acceptance "at a whim." Heurlin moved to vacate the judgment under section 663a (legal basis for the decision not consistent with or supported by the facts). He proposed entry of a judgment pursuant to the section 998 offer and acceptance, "that John M. Heurlin shall have and recover judgment against Michael DeRose in the sum of $7,000.00, each party to bear their own costs of suit herein." Heurlin contended the court was without discretion to refuse to enter a judgment reciting words precisely as stated in the offer and acceptance. He asserted entry of a section 998 judgment is purely a ministerial act and the court exceeded its authority in adjudicating a factual dispute. He argued neither DeRose's offer nor Heurlin's acceptance contained language pertaining to DeRose's recovery of $9,063.95, the court never received or heard evidence or made any finding on the issue, and it could not now do so because the offer and acceptance had been tendered to the court for entry of judgment, leaving the court without discretion in the matter.

*Hearing of October 17*

On October 17, 2000, the court conducted a hearing on Heurlin's motions and proposed judgment. Heurlin said he specifically advised DeRose's attorney, "All right. You pay me $7,000 over and above what I have [in the trust account] because that was my claim, and that's the end of the case." When the court observed, "[T]hat's not what the acceptance says. It never said anything about over and above the claim," Heurlin responded, "Oh, Your Honor, it's not my duty." He argued, "Now, if the court enters the judgment that I propose, which simply says judgment for Heurlin for the sum of $7,000, which is what was offered and which is what was accepted, we'll go on from there." The court asked, "Okay. What does that mean 'we'll go on from there'?" Heurlin responded, "Your Honor, it means that I'll have a judgment for $7,000 and will act in accordance with that judgment."

The court persisted, asking Heurlin, *"What happens to the remaining money you're holding? I assume you are holding it."* (Italics added.) Heurlin replied: *"Yes; exactly."* (Italics added.) The court then asked, "What happens to them [the funds]?" When Heurlin answered, "It's mine," the court stated, "See, that's the dispute. Seven-thousand is represented as resolving the entire case. You've got extra money in there." Heurlin retorted, "See, I don't. And the reason that I don't is if that were the case, then what the offer should have said is we offer to pay Mr. Heurlin $7,000 out of the [$]16,000 he's holding, and he is to return $9,063.[95] to Michael DeRose. If that's what they meant to say, that's what they should have said, but that wasn't the state of affairs."

The court noted "the basic problem" under Heurlin's approach was that the section 998 offer and acceptance did *not* settle the entire case. There was still the matter of the disputed trust fund monies, which would generate further litigation. Brown reminded the court the $16,000 "was held in trust. It wasn't [Heurlin's] money to offer to pay or not to pay. He agreed to place it in trust."

The court then addressed Heurlin, asking, "I'm curious. *Is this money accumulating interest?*" Heurlin responded, *"To the State Bar, Your Honor."* (Italics added.) When Brown interjected that it appeared Heurlin had removed the funds from the client's trust account, Heurlin said, *"That's a lie. That's neither here nor there. . . . [I]t's an absolute lie. I['ve] got the account records,* but it's not relevant. Let's proceed with the entry of judgment pursuant to 998 which is merely a ministerial act which may be performed by the clerk or the court." (Italics added.) (In his reply brief, Heurlin again attacked the claim that the funds were no longer in his trust account as "demonstrably untrue" and challenged "[t]his Court's Justices . . . to call the [800] number and attempt to obtain the information claimed to have been obtained by DeRose.") Heurlin warned the trial court, "I guarantee you that if you don't follow the law and you don't follow the facts, that this will go to the next level. You know it has to." Noting that would be just fine, the court took the case under submission and adjourned the hearing.

*Minute Order of October 25 and Judgment upon Statutory Offer of Compromise*

On October 25, 2000, based on Heurlin's representation that the funds were in his client trust account, the court issued its minute order as follows: "That John M. Heurlin shall have and recover judgment against Michael DeRose in the sum of $7,000.00, each party to bear their own costs of suit herein. [Heurlin] may not execute on this judgment until the remaining funds being held by him are returned to DeRose. Judgment signed and filed this date."

The final form of the judgment entered by the court was as proposed by Heurlin, with the exception of the court's handwritten interlineations indicated here in italics: "This action having been commenced by Michael DeRose on April 17, 2000, and John M. Heurlin and The Law Offices of John M. Heurlin having appeared . . . and having served a cross-complaint . . . , and Michael DeRose having offered in writing served on [Heurlin] on June 28, 2000 . . . and [Heurlin] having timely accepted Michael DeRose's offer, and the offer with proof of acceptance having been duly filed with this Court, *and Heurlin's representation at the 8-29-00 and 10-17-00 hearings*

*that this $7000 settles both the complaint and cross-complaint* [¶] IT IS HEREBY ORDERED AND ADJUDGED that John M. Heurlin shall have and recover judgment against Michael DeRose in the sum of $7,000.00, each party to bear their own costs of suit herein. *Heurlin may not execute on this judgment until the remaining funds being held by him are returned to DeRose.*" (Italics added.)

### October 25 Postjudgment Correspondence and Motions

On October 27, 2000, two days after the court's entry of judgment, Heurlin sent a letter to Brown, enclosing a copy of the judgment and announcing his intention to flout the court's orders. Heurlin stated: "As I am sure you are aware, all extant orders merge into the final judgment which is the sole dispositive pleading in the case. [¶] I fail to observe any place at which [the judgment] directs me to return $9,063.95 plus interest at the legal rate of 10% per annum. The judgment merely observes that I cannot execute on the $7,000.00 unless '. . . the remaining funds being held by [me] are returned to DeRose.' *As I have no remaining funds, I suppose I can move directly to execute on the judgment.*" (Italics added.)

Heurlin further stated he would soon file a motion to vacate the judgment and enter a different judgment, adding, "Depending on what the Court does with the Motion to Vacate, we will either move to appeal or execute on the $7,000.00 judgment. I think [it is] in the best interests of the record that we have a final hearing on the judgment. [¶] Have a great day. I have!"

Heurlin filed his second motion under section 663 to vacate the judgment and enter a different judgment. Heurlin essentially reiterated his first motion, but this time he argued he never would have accepted DeRose's offer had he known it meant he would have to give back the client trust fund monies. He asserted, "A clear reading of the offer is that DeRose offered to pay Heurlin $7,000.00 *in new money* to end the litigation." (Italics added.) He argued, "Essentially, [the court] has crammed a whole liability issue down Heurlin's throat that was never agreed-to by him and saddled him with a duty which was never a part of the bargain."

Meanwhile, DeRose moved the court under section 1008 to reconsider its order granting Heurlin a $7,000 judgment. DeRose emphasized that at the October 17 hearing, Heurlin represented that all of the money was in his trust account, but after receiving notice of the court's decision, he had "cleaned out the trust account[, t]hereby circumventing the Court's order." Based on these new facts, DeRose asked the court to reconsider and set aside its order of October 25, direct Heurlin to deposit the $16,063.95 with the

court or in an account requiring the signatures of DeRose and Heurlin, or enter a judgment of $9,063.95 plus interest in DeRose's favor. DeRose also filed a "limited joinder" in Heurlin's motion to vacate, stipulating to set aside acceptance of the section 998 offer, and asking the court to reaffirm a prior order referring the case to arbitration.

*Hearing of December 15*

The parties' motions were heard on December 15, 2000. The court opened the proceeding by stating, "My initial reaction, frankly, was to deny both motions[.] The more I thought about it, . . . I thought we obviously have both sides who don't want this judgment. I mean it doesn't make much sense to keep it the way you feel about it. [¶] So I'm going to grant both motions, but I'm not entering another [judgment]. I think we're going to have to unwind this thing at some point. [¶] My problem is I'm not sure how far back we can unwind it." Finding it apparent "there was a total misunderstanding as to what was going on," the court observed even Heurlin had conceded as much in his declaration by stating that if he had been aware of the meaning attached to the offer by DeRose and the court, he never would have accepted it.

After listening to further argument by Heurlin, the court stated, "Well, you both want the judgment vacated; that, I will do. But I'm not entering the judgment that either of you want. What we're going to have to do is go back to some point. [¶] So what I'm going to do is have you start basically at ground zero. If you [DeRose] want to make that offer, you [Heurlin] want to accept it, fine. If you want to go to arbitration, that's fine with me, too. . . . [¶] I don't care how you resolve it. It's really up to the two of you." The court then granted the motions to vacate the judgment, denied the motions to enter a new judgment, and issued an order setting aside Heurlin's acceptance of the section 998 offer.

*Order of December 29*

The court's formal order filed December 29, 2000 stated, "Good cause appearing, IT IS HEREBY ORDERED that [DeRose's] and [Heurlin's] Motions to Vacate this Court's prior judgment are granted. On the court's own motion, [Heurlin's] Notice of Acceptance of [DeRose's] C.C.P. § 998 Offer is hereby ordered set aside, based on declarations of both parties of mistake re the offer and acceptance." Heurlin appealed, contending the court had a duty to enter judgment awarding him $7,000 under the section 998 agreement.

*Oral Argument on Appeal and Notice Regarding Sanctions*

Heurlin did not appear personally at the scheduled April 16, 2002 oral argument. In his stead, he sent an attorney with no personal knowledge of

the facts necessary to respond to our questions. It appears this was no accident: An association of counsel was filed on April 12, 2002; a disassociation of counsel was filed on April 16, 2002, after oral argument. Both the association and disassociation were dated April 5, 2002. (We do not intend in this opinion to criticize Attorney Caligiuri or her law office or to sanction them.)

At the end of the hearing on April 16, the parties were given oral notice that argument would be continued to the following month and the court was considering imposing sanctions on Heurlin. On April 18, we issued a written order directing Heurlin to appear personally at the continued oral argument on May 22. The order stated the court was "considering imposing sanctions payable to the court, or such damages as may be just payable as costs to respondent, or both, in a total amount not to exceed $50,000 against John M. Heurlin and Law Offices of John M. Heurlin, individually as parties, and John M. Heurlin, as counsel, on the ground the appeal is frivolous, and taken and maintained solely for purposes of delay, . . . and for possible attorney misconduct affecting the orderly administration of justice." We advised Heurlin he could file written opposition by a date certain and argue the sanctions issue at the May 22 hearing.

## The Parties' Settlement and Stipulation for Dismissal

On April 24, 2002, DeRose's counsel advised this court in writing the parties had settled the underlying case. We again ordered Heurlin in writing to appear at the continued oral argument.

On May 3, we received a "Stipulation for Dismissal of Appeal and [Proposed] Order of Entry of Dismissal" signed by Heurlin and Day. We advised the parties in writing we would decide whether to dismiss the appeal after the May 22 hearing, and reiterated our order for Heurlin to appear at the hearing.

## Heurlin's Opposition to Sanctions and the May 22 Hearing

In his written opposition to sanctions and his cover letter filed on May 7, 2002, Heurlin contended settlement of the case had obviated any possible basis for sanctions. He explained he had settled only because of "the implicit threat to Appellant's family and Appellant's limited financial resources" posed by "the draconian nature of the sanctions placed at issue." He stated that although no basis for sanctions had ever existed, "[t]he matter settled because, metaphorically, this Court held a gun to Appellant's head, in the form of a $50,000.00 sanction notice, and Appellant could not run the risk

that a Court that would even issue such an order might not, in fact, follow through with its threat," resulting in "further abuse." He maintained his appeal was neither substantively without merit nor prosecuted for improper purposes. He claimed the court's notice regarding sanctions was untimely and otherwise inadequate in that it set forth only general statutory language as grounds for sanctions. He asked the panel to disqualify itself because DeRose and Day had disclosed the amount of the settlement to the court. Heurlin attached a copy of the settlement agreement to his opposition papers, but redacted the amount paid.

At oral argument on May 22, 2002, the court denied Heurlin's request for disqualification. Heurlin made an oral presentation, essentially repeating arguments made in his letter and opposition papers. Heurlin expressed his belief he had done nothing improper throughout the litigation.

Justice Rylaarsdam asked Heurlin a number of specific questions about his conduct vis-à-vis his former client. In a summarizing general query, Justice Rylaarsdam asked, "Do you feel, sir, that the way you conducted yourself in this litigation is appropriate? . . . I want that question answered 'yes' or 'no.'" Heurlin responded, "Yes."

The panel asked Heurlin questions directed at his handling of the client trust funds. We inquired about the basis for Heurlin's representations to the trial court on October 17, 2000, statements in his letter of October 27, 2000, and his positions on appeal. Heurlin's responses to questions concerning (1) whether on October 17 he had the funds in a client trust account as represented to the court and (2) whether there were "no remaining funds" in that trust account on October 27 were, as follows:

"Justice Fybel: . . . [¶] So my question to you, sir, is: On October 17th, 2000, was the $16,063.95 in your trust account?

"Mr. Heurlin: No. $16,093.63 [*sic*] was not in my trust account. But that was not—

"Justice Fybel: Were any of the funds that the judge was referring to on October 17th, 2000, in your trust account at that time?

"Mr. Heurlin: Yes, Justice Fybel.

"Justice Fybel: How much[?]

"Mr. Heurlin: As I recall—as I recall, it was [$]9,063 and change.

"Justice Fybel: Where was the remaining [$]7,000?

"Mr. Heurlin: That was in my general account.

"Justice Fybel: On October 25th, 2000, . . . the court issued an order stating that you . . . shall have and recover judgment against Michael DeRose in the sum of $7,000; each party to bear their own costs of suit herein; Heurlin may not execute on this judgment until the remaining funds being held by him are returned to DeRose; judgment signed and filed this date, . . . and the date is October 25th, 2000. . . . [¶] Then, . . . you state that, quote, 'As I have no remaining funds, I suppose I can move directly to execute on the judgment.'

"Mr. Heurlin: That was—

"Justice Fybel: . . . [¶] The first question is: On October 27th, 2000, when you wrote this letter, did you have the $9,063.95 in your trust account?

"Mr. Heurlin: I do not know.

"Justice Fybel: On October 27th, 2000, did you have any of the money that was originally placed in your trust account with regard to the DeRose matter still in the trust account?

"Mr. Heurlin: On that specific date, I do not know.

"Justice Fybel: Well, when you wrote, 'As I have no remaining funds, I suppose I can move directly to execute on the judgment,' when you were referring to 'remaining funds,' what were you referring to?

"Mr. Heurlin: If the court will continue to read in that letter, it will see that the purpose of that letter was to advise him that I was making a motion to vacate judgment and enter a different judgment.

"Justice Fybel: . . . [P]lease answer my question if you can.

"Mr. Heurlin: Understand.

"Justice Fybel: When you were referring to remaining funds in that letter, what were you referring to?

"Mr. Heurlin: I don't remember.

"Justice Fybel: Are there any documents that could refresh your recollection . . . . [¶] . . . [¶] [a]s to where . . . either the $9,063.95 or the $7,000 were on October 27, 2000?

"Mr. Heurlin: I don't know.

"Justice Fybel: . . . [¶] Was it a true statement on October 27th, 2000, that you have no remaining funds?

"Mr. Heurlin: My balance on that date, I believe, was about $108,000. So, to answer—

"Justice Fybel: Mr. Heurlin, please answer my question. [¶] Was it a true statement, when you wrote on October 27th, 2000, that you had no remaining funds?

"Mr. Heurlin: I don't know.

"Justice Fybel: When was the $7,000 removed into your general account?

"Mr. Heurlin: On or about the end of May or, let's see—yes, it would have been the end of May of 2000.

"Justice Fybel: Why?

"Mr. Heurlin: Because Mr. Day wrote me a letter . . . which indicated that I was permitted to retain $12,590.70 as my fees in handling the . . . DeRose matter.

"Justice Fybel: . . . I'm going to ask this again just to make sure we have a clear record. [¶] With regard to the $9,063.95 that you say was in your trust account at some point in time, when was that removed?

"Mr. Heurlin: I don't know. But it was—

"Justice Fybel: Can you approximate when it was?

"Mr. Heurlin: It would have been towards the end of October, I believe.

"Justice Fybel: Of 2000?

"Mr. Heurlin: Yes. Although there was always $3,347.25 in the account.

"Justice Fybel: In which account?

"Mr. Heurlin: Trust account. If the court—

"Justice Fybel: Always until when?

"Mr. Heurlin: Until I paid it over to Mr. DeRose and Day . . . on April 24th.

"Justice Fybel: Of 2002?

"Mr. Heurlin: Correct.

"Justice Fybel: So is it your position now that there were in excess of $3,000 of remaining funds as of October 27th, 2000?

"Mr. Heurlin: I believe so.

"Justice Fybel: So . . . , just so we understand, now your position is that as of October 27th, 2000, there were, in fact, over $3,000 in remaining funds; so your statement that you had no remaining funds was not true?

"Mr. Heurlin: I don't know what the state was as of October 27th of 2000, Justice Fybel. I have no idea.

"Justice Fybel: But I thought you just said that at all times the $3,000-plus [was] sitting in the trust account.

"Mr. Heurlin: I never took that money out. So my assumption is, is that it was there.

"Justice Fybel: Well, then, with regard to any money that was taken out of the trust account during this period of time, who took it out?

"Mr. Heurlin: I would have taken it out.

"Justice Fybel: And the money went from the trust account into the . . . Heurlin general account?

"Mr. Heurlin: General account.

"Justice Fybel: That's the general account for your law office?

"Mr. Heurlin: Correct.

"Justice Fybel: That's the account used to pay your bills?

"Mr. Heurlin: Correct."

At the conclusion of the hearing, when asked whether he had anything further, Heurlin responded, "Nothing further." Presiding Justice Sills then

offered Heurlin an opportunity to "answer the questions on the account that were posed by Justice Fybel at a later time." Heurlin declined this offer to respond.

## DISCUSSION

Throughout the proceedings both in the trial court and on appeal, Heurlin has argued the court had a mandatory duty to enter a section 998 judgment because an offer and acceptance were filed. According to Heurlin, the trial court was without discretion to *decline* to enter the judgment, even though it knew (1) the parties disagreed as to the meaning of the offer and acceptance, and (2) Heurlin did not intend to return the trust funds to his former client. We find this proposition untenable. Were we to reach the merits, we would decide that the court could have and should have refused to enter the judgment. This decision is consistent with the analysis of section 998 in the recent unanimous decision of our Supreme Court in *Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249 [121 Cal.Rptr.2d 187, 47 P.3d 1056]. (See also *T. M. Cobb Co. v. Superior Court* (1984) 36 Cal.3d 273, 280 [204 Cal.Rptr. 143, 682 P.2d 338] [general contract law principles apply to § 998 offers and acceptances where they neither conflict with the statute nor defeat its purpose].) In addition, the court properly vacated the judgment that was based on Heurlin's false representations that he held the disputed funds in his trust account.

Turning to the issue of sanctions, this court's notice filed April 18, 2002, tracked the language of Code of Civil Procedure section 907 (permitting costs when an appeal is "frivolous or taken solely for delay") and rule 26(a)(2) of the California Rules of Court (permitting imposition of penalties, including costs "[i]f the appeal is frivolous or taken solely for the purpose of delay"). Our Supreme Court's definition of "frivolous" in this context was set forth 20 years ago in *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179]: "[A]n appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—*or* when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit." (Italics added.) At the hearing on May 22, 2002, Heurlin agreed that this is the correct standard to determine whether sanctions should be assessed.

We conclude Heurlin filed and prosecuted a frivolous appeal within the meaning of section 907, California Rules of Court, rule 26(a)(2), and *In re Marriage of Flaherty, supra,* 31 Cal.3d 637, 650. We reach this conclusion because Heurlin filed and maintained the appeal for improper motives—to

delay the effect of an adverse judgment and to cover up his mishandling of client trust funds and his dishonesty before the trial court. We do not reach the question of whether Heurlin's appeal also indisputably had no merit.

On April 24, 2000, Heurlin promised in writing to retain the client trust funds until the fee dispute with DeRose was resolved. Heurlin's October 17 representations to the trial judge (that he held the client trust funds) led to an October 25 judgment that was based on the judge's understanding Heurlin was holding client trust funds. The court fashioned the judgment to award Heurlin the sum of $7,000 under the section 998 offer, but delay execution until Heurlin returned the "remaining" client trust funds he represented to the court he was holding. Upon reading the judgment, Heurlin announced he could take $7,000 and keep an additional $16,063.95 because "there are no remaining funds." This change of position by Heurlin was the basis for the order vacating the judgment, which judgment was originally based on Heurlin's representation. The December 29 orders vacating the judgment and refusing to enter a different judgment were proper.

Did Heurlin actually have client DeRose's funds in a trust account on October 17, 2000, as he represented to the court? At the hearing on May 22, 2002, Heurlin admitted that on October 17, 2000, he only had $9,063.95 and that he took the other $7,000 for himself months earlier in May 2000.

Did Heurlin really have DeRose client trust funds to return on October 27 or had he already taken them for himself? On October 27, after receipt of the court's judgment, he asserted there were "no remaining funds." True? On appeal, Heurlin has taken at least five different positions as to whether or not there were any remaining funds on October 27, 2000:

(1) In his opening brief, Heurlin acknowledged, "As this Court has probably concluded, the nuts and bolts of the dispute revolve around the character of the $16,063.[95] held by Heurlin from DeRose's settlement proceeds." Did Heurlin actually hold these proceeds? In his reply brief, Heurlin characterized the claims that the DeRose client trust funds were no longer in his trust account as "demonstrably untrue. . . . As a matter of fact, Heurlin's balance was between $23,670 and $267,000 during the operative period. Heurlin never 'stole' anything, but again the issue is relevance."

(2) Heurlin's lawyer at oral argument on April 16, 2002, acknowledged the letter dated October 27, 2000, stated there were "no remaining funds" on that date and stated she had no further knowledge of the relevant facts.

(3) As of May 22, 2002, Heurlin did not know if the so-called remaining funds (that he identified to us as the sum of $9,063.95 existing in the account on Oct. 17, 2000) were still in his trust account on October 27, 2000.

(4) On May 22, 2002, Heurlin told us there was $3,347.25 in the trust account at all times until April 24, 2002, including on October 27, 2000.

(5) Later on May 22, 2002, Heurlin advised us he did not know the amount in his trust account on October 27, 2000.

Heurlin admitted that to the extent the funds were taken out, he took the money and it went into his general account to pay his bills.

Heurlin's conduct, statements and admissions show that he took all or part of the client trust funds for himself without notice or authority and in breach of both his written promise to hold the funds and his representations to the court. When the court issued its adverse ruling vacating the judgment, Heurlin appealed. We conclude from all the evidence that he did so to delay the consequences of his deceit and to try to cover up his mishandling of client trust funds.

In his opposition to our order notifying him we were considering sanctions, Heurlin complained of inadequate notice. The Supreme Court in *In re Marriage of Flaherty, supra,* 31 Cal.3d at page 654, held "the rudiments of fair play include notice, an opportunity to respond, and a hearing." We agree. We gave "fair warning, affording the attorney an opportunity to respond to the charge, and holding a hearing." (*Ibid.*) By this opinion, we are providing the attorney with a "written statement of the reasons for the penalty." (*Ibid.*) Heurlin also complained notice by the court was untimely, but the notice provided by our April 18 order complied with California Rules of Court, rule 26(e).

The April 18, 2002, order advised Heurlin of the grounds and legal authority for possible sanctions; Heurlin was permitted to, and did, respond in writing by filing a 25-page brief and a substantive cover letter; he was given a hearing; at the end of the hearing, he stated he had nothing further to add and he declined the opportunity to provide any further responses in writing to the court's questions. The record cited above contains an abundance of statements by Heurlin himself that he knew the key issue (or "nuts and bolts" as he described it) in the case was his handling of the client trust funds. Questions we asked at the May 22 hearing regarding the client trust funds were also asked of Heurlin's lawyer at the April 16 hearing. Heurlin's claim to be in the dark about the court's concerns is belied by the record.

■ A reviewing court may impose penalties for a frivolous appeal to vindicate the public interest in the orderly administration of justice. "Because a frivolous appeal, or one taken for improper reasons, harms the court,

not just the respondent, a growing number of courts are ordering appellants to pay sanctions directly to the court clerk to compensate the state for the cost of processing such appeals. [Citations.]" (*Pierotti v. Torian* (2000) 81 Cal.App.4th 17, 35 [96 Cal.Rptr.2d 553].)

In deciding the amount of sanctions, courts may consider "the degree of objective frivolousness and delay[,] and the need for discouragement of like conduct in the future." (*Pierotti v. Torian, supra,* 81 Cal.App.4th at pp. 33-34.) Here, the degree of objective frivolousness and delay is high and the need to discourage like conduct in the future is compelling. (See *Keitel v. Heubel* (2002) 98 Cal.App.4th 678, 693-694 [120 Cal.Rptr.2d 216].) Heurlin took this appeal for the improper purposes of delay and to try to cover up his mishandling of client trust funds and his dishonesty before the trial court.

The *Pierotti* court found the sum of $6,000 a conservative measure of sanctions, noting that approximate amount had been estimated as the cost of processing the average civil appeal in 1992. (*Pierotti v. Torian, supra,* 81 Cal.App.4th at p. 36.) More recently, in *Keitel v. Heubel, supra,* 98 Cal.App.4th 678, 693-694, the sum of $6,000 was again imposed as sanctions for processing a frivolous appeal. We suspect the real cost of processing the average civil appeal has risen sharply in the past 10 years. Nonetheless, we follow the *Pierotti* court's cautious approach and sanction Heurlin in the amount of $6,000 plus the cost of the reporter's transcript of the hearings of April 16 and May 22, 2002, payable to the clerk of this court.

## DISPOSITION

The appeal is dismissed pursuant to the parties' stipulation.

As sanctions for bringing and maintaining this frivolous appeal, John M. Heurlin and the Law Offices of John M. Heurlin are jointly and severally liable to pay $6,000 plus $123 (the cost of the reporter's transcript) to the clerk of this court. The clerk of this court is directed to deposit said sums in the general fund. All sanctions shall be paid no later than 30 days after the date the remittitur is filed.

Pursuant to Business and Professions Code section 6086.7, subdivision (c), the clerk of this court is ordered to forward a copy of this opinion to the State Bar upon return of the remittitur. Pursuant to Business and Professions Code section 6068, subdivision (*o*)(3), Heurlin is ordered to forward a copy of this opinion to the State Bar upon return of the remittitur.

Each party to bear its own costs on appeal, pursuant to the parties' stipulation.

Sills, P. J., and Rylaarsdam, J., concurred.