Filed 8/25/21  In re The David and Rose Markowitz 1998 Trust CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re THE DAVID AND ROSE MARKOWITZ 1998 TRUST, Dated JUNE 2, 1998;<br><br>JOSEPH MARKOWITZ,<br><br>Petitioner and Appellant,<br><br>v.<br><br>SAUL MARKOWITZ, et al.,<br><br>Respondents. | B297630<br><br>(Los Angeles County Super. Ct. No. 17STPB08890) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gus T. May, Judge.  Affirmed.

Posner Law Corporation and Ashley D. Posner for Petitioner and Appellant.

Marcus, Watanabe & Enowitz, David M. Marcus and Daniel J. Enowitz for Respondent Saul Markowitz.

Buley Law and Michael J. Buley for Respondent Philip Markowitz.

This action is the latest in an ongoing dispute between members of the Markowitz family. The background of the underlying controversy is factually and procedurally complex, involving the strained relationship of and litigation between several family members in their struggle over the family's fortune. The issue on appeal, however, is straightforward. Joseph Markowitz appeals from an order granting his brothers' motions for sanctions, made pursuant to Code of Civil Procedure section 128.7,[1] dismissing this action and imposing monetary sanctions of $12,145, jointly and severally against Joseph and his attorneys. We conclude the trial court acted well within its discretion in imposing sanctions and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Markowitz Family and the Markowitz Trust*

David and Rose Markowitz (David and Rose, respectively) had three sons: petitioner and appellant Joseph Markowitz (Joseph), and respondents Saul Markowitz (Saul), and Philip Markowitz (Philip).[2] In June 1998, David and Rose established the David and Rose Markowitz 1998 Trust (Markowitz Trust) and named themselves co-trustees. The Markowitz Trust provides that, in the event of the incapacitation or death of David or Rose, the survivor shall act as sole trustee of three sub-trusts (i.e., Trusts A, B and C).

The Markowitz Trust contained 100 percent community property and was composed of bank accounts and several parcels of real property, with a collective value of at least $10 million. The real property included the family

---

[1] Further unspecified statutory references are to the Code of Civil Procedure.

[2] We refer to the parties and nonparty family members by their first names for the sake of clarity and intend no disrespect.

home at 318 North California Street, Burbank, California (Burbank property), and apartment buildings at 9311-9333 and 9339-9345 Sepulveda Boulevard, North Hills, California (Sepulveda property) and 610-614 East Chevy Chase Drive, Glendale, California (Chevy Chase property).[3]

The Markowitz Trust provides that upon the death of the first spouse, 50 percent of the community assets are to be segregated into two irrevocable trusts (Trusts B and C), with the surviving spouse's 50 percent share of the community assets remaining in a revocable trust (Trust A) until his or her death, at which point Trust A's assets are subject to federal estate taxes. As for Trusts B and C, the Markowitz Trust states: "Decedent's Marital Share shall consist of one-half (1/2) interest in the Joint Property of the Trust Estate, and the Separate Property of the Decedent Settlor. Decedent's Marital Share shall be divided into the Decedent's Trust B and Trust C. Upon creation of such Trust shares, Decedent's Trust B and Trust C are irrevocable. [¶] The Trustee shall have sole discretion to select that portion of the joint assets which shall be included in the Marital Share (Decedent's Trust B and Trust C)."

The Markowitz Trust also provided that upon the death of David and Rose and prior to distribution of the trust estate, "the following gifts shall be made outright and free of trust: [Joseph] shall receive the [Sepulveda

---

[3]     The Markowitz Trust states that the trust property is identified in a "Schedule 'A' [and] any Addendum to Schedule 'A' attached" to the Trust instrument. However, the record does not contain a copy of this "Schedule A" attached as exhibits to the initial or any amended petition filed in this action. The absence of Schedule A is immaterial to our discussion, as there is no dispute that the rest of the Markowitz Trust included at least the Sepulveda, Burbank and Chevy Chase properties at issue here.

3

Property] . . . [and Saul] shall receive the [Burbank property] and the [Chevy Chase property]."

Initially, Joseph and Saul were designated as 50 percent beneficiaries of the Markowitz Trust. After David died in July 2006, Rose became the sole trustee.

*Amendments, Restatements and Revocation of The Markowitz Trust*

Between the time of David's death and January 2014, Rose executed several amendments to the Markowitz Trust. On January 6, 2014, Rose revoked her prior amendments to and restatements of the Markowitz Trust and reaffirmed a May 15, 2009, Second Amendment and Restatement of the Markowitz Trust.

Two days later, on January 8, 2014, Rose executed a Third Restatement of the Markowitz Trust, revoking prior dispositive provisions and amendments (dated May 15, 2009, and January 6, 2014), and designating an (unnamed) conservator as her sole successor trustee. That same date, Rose executed a notarized affidavit stating that Joseph and Philip each had subjected her to significant pressure regarding her estate, and that Philip had been disinherited. Rose further stated that, due to "tremendous friction between them," neither Saul nor Joseph could serve as successor trustee as Rose feared "they would never be able to be fair to one another." Rose expressed her wish to "place [her] estate under conservatorship because [she was] reaching the point where [she could not] take any more pressure from [her] sons relative to [her] estate and reaching the point where [she was] not able to resist pressure from them." Specifically, Rose "want[ed] a conservatorship of [her] estate because: [¶] . . . [She was] afraid [she would] be pressured to make more amendments and [she] want[ed] the protection of

4

the court[,]" and she "believe[d she was] unable to manage [her] trust or [her] husband's irrevocable trusts with all of the pressure [she was] getting from [her] sons to use the money for their current benefit rather than [her] own." Rose did not identify a nominee to serve as conservator of her estate.

On December 23, 2014, Rose revoked the Markowitz Trust.

No conservator was appointed prior to Rose's death on November 9, 2017.

*Previous Litigation*

The record reflects that Rose had reason for concern that friction between her sons would prevent them from dealing fairly with one another with regard to the distribution of their parents' estate.

A. *The Initial Probate Action and Rose's Revocation of Trust A*

On November 20, 2014, two weeks after Rose disinherited him, Joseph filed a probate action, *In The Matter of The David and Rose Markowitz 1998 Trust Dated June 2, 1998*, LASC case No. BP151036 (*Initial Probate Action*), against Saul and Rose seeking, among other things, to remove Saul as trustee of Trust A.

On December 23, 2014, Rose revoked the Markowitz Trust.

Notwithstanding Rose's revocation of Trust A, on March 30, 2015, Joseph filed a first amended petition in the *Initial Probate Action*.

On October 20, 2016, Rose filed a "Response . . . to [Joseph's] Supplemental Pleading To Clear Probate Notes," arguing that: "Probate Note 'C' requires a showing of [Joseph's] standing to bring [the *Initial Probate Action*] because it is undisputed that [Rose] retained the power to revoke the trust and did so. The note asks [Joseph] to make a showing (beyond mere

5

pleading) regarding [Rose's] competency to revoke the trust. The papers before the court indicate that [Joseph] has not cleared this note."

On November 1, 2016, the probate court dismissed the *Initial Probate Action* based on its conclusion that Rose's revocation of Trust A meant Joseph lacked standing to bring the *Initial Probate Action*. Joseph filed an unsuccessful motion for reconsideration. (§ 1008.)

B. *The Elder Abuse Action*

On October 16, 2014, in his capacity as Rose's attorney-in-fact, Saul filed a complaint for financial elder abuse against Joseph (LASC case No. BC560982; the *Elder Abuse Action*). Saul alleged that Joseph had engaged in a pattern of harassment of Rose, which included Joseph phoning Rose 50 to 100 times per day to demand money and Joseph's having taken control of Rose's checkbook to write checks in excess of $125,000 for his personal benefit or to himself.

Following a bench trial, the court found that Joseph engaged in a campaign of harassment by, among other things, calling his mother dozens of times per day to demand money and, when Rose refused to accede to his demands, telling her she "deserved" to die. The court awarded Saul $100,000. Joseph appealed, and our colleagues in Division Two affirmed the judgment. (See *Markowitz v. Markowitz* (May 3, 2018, B278585) [nonpub. opn.] 2018 WL 2056481.)

6

*The Instant Litigation*

### A.  *The Initial Petition*

On October 3, 2017, Joseph filed a verified petition in this action. Although Rose was then still alive, Joseph sued both his brothers in his "capacity as successor trustee" of Trusts B and C.

### B.  *The First Amended Petition*

On January 23, 2018, before his brothers responded to the petition, Joseph filed a verified First Amended Petition (FAP).  The FAP was accompanied by the same exhibits and was identical to the initial petition, except the FAP contained information that Rose died in November 2017.[4]

---

[4]  These 11 exhibits were attached to the FAP:

Exh. A-1/A-2:  Certificates of Death for David and Rose Markowitz;

Exh. B:  "Declaration of Trust Named The David and Rose Markowitz 1998 Trust," and David's Pour-Over Will (the Markowitz Trust);

Exh. C:  Undated and unsigned "Declaration of Trust; Overview of Pertinent Information," 2008 "Memorandum of Trust Funding The David And Rose Markowitz 1998 Trust," with attached "Schedule[s]" of Assets for Revocable Trusts A, B and C.

Exh. D:  May 15, 2009 "Second Restatement of The David and Rose Markowitz 1998 Trust" and Exhibit A (identifying assets of initial Trust estate), signed by Rose, and notarized;

Exh. E:  "First Amendment to Second Restatement of the David and Rose Markowitz 1998 Trust," November 25, 2013, signed by Rose and notarized;

Exh. F:  Rose Markowitz "Trustee Resignation," dated December 2, 2013, notarized December 7, 2013;

Exh. G:  January 6, 2014 "Revocation of Amendment of Living Trust," signed by Rose and notarized;

Exh. H:  January 8, 2014 "Third Restatement of the David and Rose Markowitz 1998 Trust," signed by Rose and notarized;

Exh. I:  January 8, 2014, "Affidavit of Rose Brodsky Markowitz";

The FAP alleged four causes of action by which Joseph sought to (1) quiet title against Saul's claims of ownership of the Burbank Property; (2) compel Saul to return unspecified cash, stocks, bonds and other personal property Saul allegedly had wrongfully seized; (3) compel Philip to deliver unspecified cash, stocks, bonds and other personal property he allegedly had wrongfully seized; and (4) obtain reimbursement for attorney fees and costs incurred in connection with the FAP.

Saul demurred to the FAP. He argued that no viable claim for relief had been pled against him. He also argued that each of Joseph's claims was barred by the doctrines of res judicata and collateral estoppel, and by Joseph's failure to raise his claims in a compulsory cross-complaint in the *Elder Abuse Action*.[5]

The trial court overruled Saul's demurrer to the first cause of action for return of real property to the Trust on the ground that Saul failed to produce judicially noticeable evidence contradicting Joseph's allegation that Saul wrongfully took a Trust property (the Burbank property) in 2014. However, the court sustained with leave to amend Saul's demurrer to the claim for Saul's alleged theft of personal property from the Trust. The court found the FAP's allegations on this point vague and uncertain and found that Joseph

Exh. J: December 23, 2014 "Revocation of the David and Rose Markowitz 1998 Trust Dated June 2, 1998," signed by Rose and notarized; and

Exh. K: August 8, 2014, "Grant Deed" for Burbank property from the Markowitz Trust to Saul, signed by Saul Markowitz, record of recordation, "property profile," and "sales comparables."

[5] Philip, who also demurred to the FAP and later amended petitions, has filed a joinder to and adopted by reference Saul's respondent's brief on appeal. However, Philip makes no independent substantive argument, and we address his contentions only as they pertain to issues argued on appeal.

8

failed to allege any Trust had been funded with or had acquired the cash from bonds or stocks allegedly stolen by Saul. Saul's demurrer to the second, third and fourth causes of action was overruled based on Saul's failure to establish that Joseph's derivative claims for double damages, attorney fees and costs were barred on their face or by judicially noticeable evidence.

### C. *The Second Amended Petition*

On April 11, 2018, Joseph filed a verified second amended petition (SAP), which alleged the same four claims[6] as the FAP and included the same attachments. The SAP contained a single new substantive allegation that, following David's death, certain assets of the "Irrevocable Exempt Trust[s] B [and] C," were sold, specifically, the Sepulveda property for approximately $6 million in December 2007 and the Chevy Chase property for about $3 million in September 2011, "and the proceeds from said sales in the form of cash, stocks and/or bonds was deposited to the Trust accounts." The SAP also alleged that Rose, as trustee, failed to segregate the proceeds from the two sales between and among revocable Trust A and/or irrevocable Trusts B and/or C.

Saul demurred, arguing that the SAP's new allegations still failed to establish a valid claim for relief against him for several reasons. First, he argued that the SAP did not establish that Rose ever actually created, let alone funded, Trusts B or C, so Joseph lacked standing as the purported successor trustee of nonexistent trusts.

---

[6] For an: (1) order compelling the return of allegedly stolen Trust property; (2) award of double damages for wrongful taking; (3) order quieting title to real property and imposing a constructive trust; and (4) award of attorney fees and costs.

Second, even if Rose had created and funded Trusts B and C, the SAP contained no new allegation that Saul improperly took property purportedly belonging to those trusts. Rather, Saul argued that the factual allegations in paragraph 20 of the SAP were identical to those in paragraph 20 of Joseph's FAP, which the court previously had found failed to state a viable claim for relief against Saul.

Finally, Saul argued that, assuming Joseph had standing as a successor trustee of Trusts B and C to seek recovery from Saul, and assuming further that Joseph adequately alleged that Saul improperly converted assets from those trusts, Joseph's claims for conversion and restitution were time-barred because the three-year statute of limitations on such claims began to run when Rose sold the Sepulveda and Chevy Chase properties (11 and 7 years, respectively, before Joseph initiated this action in October 2017). Saul also argued that, if Joseph believed that Rose, in her capacity as trustee of the Markowitz Trust, had improperly commingled assets of Trusts B and C with assets belonging to Trust A, Joseph's remedy had been to sue Rose prior to her resignation as trustee and within the statute of limitations, an action Joseph had not taken.

The trial court agreed that Joseph's claims arose when Rose sold the Sepulveda and Chevy Chase properties and commingled the proceeds from those sales. The court observed that Joseph filed the instant action under Probate Code section 850.[7] The court found that, "[a]s a beneficiary of the B

---

[7] Probate Code section 850 provides that "[t]he following persons may file a petition requesting that the court make an order under this part: [¶] . . . [¶] (3) . . . any interested person . . . : [¶] (A) Where the trustee is in possession of, or holds title to, real or personal property, and the property, or some interest, is claimed to belong to another." (Prob. Code, § 850, subd. (a)(3)(A); see also id., §§ 24 [defining "beneficiary"] & 48, subd. (a)(1) [defining "interested person"].)

10

and C trusts, [Joseph] was an 'interested person' in those trusts when Rose sold the real properties" and, "'[g]enerally speaking, the claim underlying a section 850 petition in probate is subject to the same statute of limitations [Code Civ. Proc., § 366.1] that would apply had an ordinary civil suit been brought.' [Citations]."[8]

The trial court noted that Joseph did not disagree that the three-year statute of limitations applied to an action involving a dispute over proceeds from the sales of the Sepulveda and Chevy Chase properties. The court rejected Joseph's assertion that, under section 366.1, no cause of action accrued until Rose's death, because section 366.1 "cannot be used to revive a cause of action that previously expired." The trial court observed that section 366.1 applies only if the statute of limitations has not already expired. Thus, "[g]iven that this action was filed more than three years after Rose allegedly commingled the proceeds from the sales of the Sepulveda and Chevy Chase properties, [Joseph could not] use . . . section 366.1 to revive his cause of action."

However, the court observed that Saul's statute of limitations defense was raised only as to proceeds from the sales of the Sepulveda and Chevy Chase properties, not as to any real property Joseph sought to transfer into Trust C. Further, neither Saul nor Philip's demurrers addressed whether the "discovery rule" may have postponed the date on which Joseph's cause of

---

[8] Section 366.1 provides: "If a person entitled to bring an action dies before the expiration of the applicable limitations period, and the cause of action survives, an action may be commenced before the expiration of the later of the following times:

"(a) Six months after the person's death.
"(b) The limitations period that would have been applicable if the person had not died."

11

action accrued and, theoretically, Joseph might be able to allege facts to avoid the statute of limitations. Accordingly, the court sustained the demurrers to the SAP with leave to amend. However, the trial court instructed Joseph that, if he chose to file a third amended petition, it must include "the pertinent facts." Specifically, any amended "petition *shall include specific details regarding how and when [Joseph] discovered* that the real properties and the proceeds of the sales of two of the real properties [the Burbank and Chevy Chase properties], were not allocated and placed into Trust B and/or Trust C." (Italics added.)

The court overruled Saul's demurrer to the extent it argued Joseph lacked standing to seek return of the Burbank property, concluding that: (1) the language of the Markowitz Trust was ambiguous as to whether Rose had been required to take affirmative steps to establish and fund Trusts B and C (which undisputed evidence [Exhibit I to the SAP] demonstrated she never took), or whether those trusts sprang into existence upon David's death; and (2) assuming Trusts B and C existed (but were never funded), if Joseph was able to demonstrate that his claims were not time-barred and ultimately prevailed in this action, Trusts B and C would be funded.[9]

---

[9] On September 13, 2018, following the trial court's ruling, Saul's counsel sent a letter to Joseph's attorneys. The letter summarized Joseph's October 22, 2015, deposition testimony in the elder abuse action. In that testimony, Joseph had acknowledged his contemporaneous awareness of the sales of the Burbank and Chevy Chase properties, as well as his receipt and use of proceeds from those sales. Saul informed Joseph's counsel that, in the event Joseph chose to file a third amended petition in the face of overwhelming evidence of his contemporaneous knowledge of the property sales, Saul intended to file a motion seeking sanctions and attorney fees, pursuant to section 128.7. Philip's counsel sent Joseph's attorneys a similar letter.

12

D. *The Third Amended Petition*

On September 18, 2018, Joseph filed the operative verified third amended petition (TAP). In response to the trial court's admonition that the TAP specify why and how the discovery rule postponed the accrual date for Joseph's section 850 claim, the TAP alleged that: "The first time [Joseph] discovered or reasonably could have discovered that Rose had not acted to fully segregate her Trust assets in the Survivor's 'A' Trust from the Trust funds of David Markowitz in his irrevocable Decedent's 'B' & 'C' Trusts *was in or about May, 2018* when the parties received the subpoenaed records of the Albience Law Firm . . . , who Rose Markowitz [had] retained to defend her against a lawsuit filed against the Trust by Philip Markowitz. It was not until those records were received that [Joseph] was able for the first time to ascertain that Rose Markowitz had not executed [counsel's proposed segregation] allocation [allocating assets into the A, B and C trusts]." (Italics added.)

E. *Demurrers to the TAP*

Saul and Philip each filed demurrers to the TAP. Saul argued that Joseph's claim that he had not discovered, and reasonably could not have discovered, Rose's failure to segregate trust assets until May 2018 was demonstrably false. Saul pointed out that Joseph had attached Rose's January 6, 2014 affidavit to his petition in the *Initial Probate Action* filed in November 2014. In that affidavit, Rose acknowledged that she had not "properly established the irrevocable trusts which were to be established following [David's] death," nor had she marshalled the assets that were to have been used to fund those trusts. In support of his assertion that Joseph's claims were time-barred, Saul asked the trial court to take judicial notice of a

13

November 13, 2014 "Ex Parte Application for Determination of Validity of Trust Amendment, etc.," filed by Joseph, to which Rose's January 2014 affidavit had been attached as an exhibit, and Joseph's declaration in support thereof. Saul also noted further that Rose's January 2014 affidavit had been attached as an exhibit both to Joseph's initial October 2017 petition in this action, and to the FAP filed in January 2018.

F. *Section 128.7 Motions for Sanctions*

In addition to their demurrers to the TAP, Saul and Philip each filed motions pursuant to section 128.7, seeking terminating and monetary sanctions against Joseph and his counsel. (§ 128.7, subd. (c).) The motions argued that the TAP was frivolous and/or was filed primarily for the improper purpose of harassment.[10] (§ 128.7, subds. (b)(1), (b)(3).)

In mid-December 2018, the trial court conducted a joint hearing on the demurrers and sanctions motions and took the matters under submission.

On February 7, 2019, the court granted Saul's and Philip's motions for terminating and monetary sanctions. The court took judicial notice of Joseph's deposition testimony in the *Elder Abuse Action*, in which Joseph had testified that he knew as early as 2006, that Trusts B and C had not been established or funded. The court concluded that this evidence, coupled with Joseph's possession of Rose's 2014 affidavit in November 2014, when he filed the *Initial Probate Action* and attached that declaration as an exhibit*,* conclusively demonstrated that Joseph knew or had reason to know that Rose

---

[10] Prior to filing the motions for sanctions, in accordance with the "safe harbor" provision, Saul and Philip forwarded the motions and supporting evidence to Joseph's counsel and notified counsel that the motions would be filed if Joseph refused to withdraw the TAP. (§ 128.7, subd. (c)(1).)

14

commingled proceeds from the sales of the Sepulveda and Chevy Chase properties and did not deposit them into Trust B or C, "well before the May 2018 date in which [Joseph] allege[d] he discovered the commingling."[11] Indeed, the court observed that Joseph specifically testified at deposition that "from 2006 through at least 2010, he periodically raised with Rose the issue regarding her failure to allocate assets to these trusts and recommended that she meet with counsel to remedy [that] situation."

The trial court also found important a contradiction between the TAP's allegations and a declaration by Joseph filed in prior litigation. In the TAP, Joseph alleged that he first learned in mid-June 2015 that Saul improperly had transferred funds from the sale of the Sepulveda property for his own use. However, in a November 12, 2014 declaration filed in the *Elder Abuse Action,* Joseph testified that Saul used the proceeds from the sale of the Sepulveda property to purchase bonds, and that "Saul [had] commandeered bond funds that were held in the Trust and [was] now using that property for his own personal advantage and profit." The court acknowledged that "such apparent misstatements may be excused in some circumstances as an oversight or wishful thinking." However, these "particular misstatements [were] not so readily excused because they are critical to this case." They were made in direct response to the court's finding that this action was time-barred unless Joseph was able to amend the TAP to state "specific details regarding how and when he discovered the pertinent facts," a "discovery that must have occurred less than three years prior to [Joseph's] October 3, 2017

---

[11]     Further, given that Joseph had attached Rose's January 2014 affidavit to the initial petition in this action, filed in October 2017, the court stated it was "entirely disingenuous for [Joseph] to allege that the 'first time' he could ascertain that Rose had not allocated the assets was in May 2018."

filing." The court noted that, although it had not expressly ordered that the TAP's allegations be supported by evidence, section 128.7, subdivision (b)(3) requires that all pleadings have evidentiary support. Moreover, Joseph verified the TAP under penalty of perjury thereby making his "objectively unsupportable allegations all the more egregious."

Finally, the court rejected Joseph's claim that he had no way to know, after Rose met with counsel in 2010, whether she allocated the assets of Trusts B or C. The court pointed out that, even if this assertion were true, "that fact would not revive an already-expired limitation period."[12]

The trial court acknowledged that terminating sanctions were "reserved for the most egregious conduct." Nevertheless, it concluded that "[g]iven the significance of these allegations to [Joseph's] ability to maintain this litigation . . . , given that they are wholly unsupported by the evidence, and given that the evidence is entirely [Joseph's] own testimony under oath, . . . nothing short of terminating sanctions [would] deter [Joseph] from continuing this conduct."

The court also found monetary sanctions appropriate because Joseph and his counsel were timely presented with conclusive evidence that this action was time-barred before Saul's and Philip's sanctions motions were filed but refused to withdraw the TAP. The court awarded $5,685 in attorney fees and costs to Philip and $6,460 to Saul and imposed the fees "jointly and

---

[12] Given its conclusion that the allegations in the TAP regarding when Joseph knew or should have known his claims arose were directly contradicted by his prior testimony and pleadings, the court declined to address Saul's further assertion that the TAP was filed for an improper purpose. (§ 128.7, subd. (b)(1).)

16

severally against [Joseph] and his counsel, the Posner Law Corporation."[13] The action was dismissed with prejudice on March 21, 2019. Joseph timely appealed.[14]

## DISCUSSION

The sole issue on appeal is whether the trial court erred in granting Saul and Philip's motions for sanctions pursuant to section 128.7, dismissing the TAP with prejudice and ordering Joseph and his attorneys, jointly and severally, to pay $12,145 in reimbursement for attorney fees and costs.

I.    *Principles Governing Sanctions Under Section 128.7 and the Standard of Review*

Section 128.7, subdivision (b) provides that:  "By presenting to the court, whether by signing, filing, submitting, or later advocating, a pleading,

---

[13]    The court overruled Saul's demurrer to the TAP.  It noted that Joseph's contention that he did not discover, nor reasonably could have discovered, that Rose commingled the property sales proceeds and did not deposit them into Trust B or C until May 2018, was inconsistent with the pleading Joseph filed in November 2014 in the initial probate action, to which he attached Rose's January 2014 affidavit.  Nevertheless, the court concluded it was not free to conclude in the context of a demurrer that Joseph possessed the January 2014 affidavit (or was aware of the information contained therein) before October 3, 2014 (three years before he filed this action).  Because the court was unable conclusively to determine based on allegations of the TAP or judicially noticeable evidence that the action was time-barred, Saul's demurrer was overruled.

For reasons we need not discuss, the court also overruled Philip's demurrer.

[14]    The Posner Law Corporation, which has continued its representation of Joseph on appeal, did not appeal from the order imposing monetary sanctions against that firm.

17

petition, written notice of motion, or other similar paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed an inquiry reasonable under the circumstances, all of the following conditions are met: [¶] . . . [¶] (3) The allegations and other factual contentions have evidentiary support . . . . [¶] (c) If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may . . . impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation." (§ 128.7, subds. (b), (c); *Garcia v. McCutchen* (1997) 16 Cal.4th 469, 481.)

Section 128.7 permits a trial court to issue monetary sanctions against a party for filing a complaint that is legally or factually frivolous. (§ 128.7, subds. (b) & (c); *Ponce v. Wells Fargo Bank* (2018) 21 Cal.App.5th 253, 264.) A complaint is legally frivolous if a "'reasonable attorney would agree that [it] is totally and completely without merit'" because it is "'not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.' [Citation.]" (*Peake v. Underwood* (2014) 227 Cal.App.4th 428, 440 (*Peake*); *Guillemin v. Stein* (2002) 104 Cal.App.4th 156, 168 (*Guillemin*).) A complaint is factually frivolous if a reasonable attorney would agree that it is "'not well grounded in fact'" because it lacks "evidentiary support" and is "[un]likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." (§ 128.7, subd. (b)(3); *Peake*, at p. 440.) "In either case, to obtain sanctions, the moving party must show the party's conduct in asserting the claim was objectively unreasonable. [Citation.] A claim is objectively unreasonable if 'any reasonable attorney would agree that [it] is totally and completely without

18

merit.'" (*Bucur v. Ahmad* (2016) 244 Cal.App.4th 175, 189 (*Bucur*); *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.)

Section 128.7 requires a preliminary procedure. Before filing its motion, the movant must serve the motion for sanctions on the offending party. Service of the motion begins a 21-day safe-harbor period during which the sanctions motion may not be filed with the court. During the safe-harbor period, the offending party may avoid sanctions by withdrawing or correcting its improper pleading. (§ 128.7, subd. (c)(1).) This remedial provision is designed to permit an offending party to withdraw its improper pleading without penalty, thereby saving the court and parties time and money litigating the offending pleading and sanctions request. (*Optimal Markets, Inc. v. Salant* (2013) 221 Cal.App.4th 912, 920 (*Optimal Markets*); *CPF Vaseo Associates, LLC v. Gray* (2018) 29 Cal.App.5th 997, 1003 [by providing safe-harbor period, the Legislature designed the statute to be remedial, not punitive]; *Primo Hospitality Group, Inc. v. Haney* (2019) 37 Cal.App.5th 165, 174 [although the statute permitting sanctions against counsel for presenting frivolous claims allows for reimbursement of expenses, including attorney fees, its principal aim is to deter abusive filings, not to compensate those affected by them].)

If the moving party has satisfied the elements of the sanctions statute and the targeted party fails to take advantage of the safe-harbor period and withdraw the frivolous filing, the trial court has broad discretion to impose sanctions. (*Bucur, supra,* 244 Cal.App.4th at p. 190; *Peake, supra,* 227 Cal.App.4th at p. 441.) Section 128.7 applies solely to misconduct in the filing or advocacy of groundless claims made in signed pleadings and other papers (§ 128.7, subd. (b)), and requires only a showing that the challenged conduct was "'objectively unreasonable.'" (*Guillemin, supra,* 104 Cal.App.4th

19

at p. 167; accord, *Optimal Markets, supra*, 221 Cal.App.4th at p. 921.) Sanctions "imposed for violation of [section 128.7,] subdivision (b) shall be limited to what is sufficient to deter repetition of [the improper] conduct or comparable conduct by others similarly situated." (§ 128.7, subd. (d).) "When imposing sanctions, the court shall describe the conduct determined to constitute a violation of . . . section [128.7] and explain the basis for the sanction imposed." (§ 128.7, subd. (e).)

"We review a section 128.7 sanctions award under the abuse of discretion standard. [Citation.] We presume the trial court's order is correct and do not substitute our judgment for that of the trial court. [Citation.] To be entitled to relief on appeal, the court's action must be sufficiently grave to amount to a manifest miscarriage of justice. [Citation.]" (*Bucur, supra*, 244 Cal.App.4th at p. 190; *Peake, supra*, 227 Cal.App.4th at p. 441.)

II.     *Joseph has Failed to Demonstrate that the Order Granting Terminating and Monetary Sanctions Was an Abuse of Judicial Discretion*

The trial court found that the allegations in the TAP were frivolous, in that they lacked legal or factual merit, and imposed sanctions pursuant to 128.7, subdivision (b)(3).

In his motion for sanctions Saul argued that the court should dismiss the action based on Joseph's demonstrably false claim in the TAP that the first time he discovered or reasonably could have discovered that Rose commingled the proceeds from the sales of the Sepulveda and Chevy Chase properties and did not deposit the proceeds in either Trust B or C, was in May 2018. The trial court agreed and found that, "these allegations are contradicted by the only reasonable inferences raised by the January 8, 2014 declaration of Rose Markowitz that [Joseph] himself filed." The court

observed that, although it had no evidence that Joseph "received that declaration more than three years before he filed this action on October 3, 2017, the fact that he included this declaration with his November 13, 2014 filing in [the Initial Probate Action] demonstrates that [Joseph] knew, or had reason to know, well before the May 2018 date in which he alleges he discovered the commingling. Moreover, [Joseph] attached this declaration [as an exhibit] to the initial petition [in the instant action that] he filed on October 3, 2017. [Petition filed Oct. 3, 2017, at Exh. I.] It is entirely disingenuous for [Joseph] to allege that the 'first time' he could ascertain that Rose had not allocated the assets was in May 2018."

Further, the trial court noted that there was evidence that Joseph had "directly contradicted this allegation in testimony he provided in prior proceedings. Specifically, during his May 10, 2016 deposition [in the *Elder Abuse Action*, Joseph] testified that he knew as early as 2006, upon David's passing, that Trusts B and C were neither established nor funded. In fact, Joseph testified that from 2006 through at least 2010, he periodically raised with Rose the issue regarding her failure to allocate assets to these trusts and recommended that she meet with counsel to remedy this situation."

The court acknowledged Joseph's argument "that Rose did ultimately consult with an attorney in 2010 and that he had no way of knowing whether she allocated the assets to the B and C trusts as a result of that meeting." However, it pointed out that "that fact would not revive an already-expired limitation period." Moreover, the court observed that in October 2015 and May 2016 depositions in prior litigation, Joseph "testified that he knew of the Sepulveda . . . property sale as it was pending . . . , and that he knew that the proceeds of those sales were not allocated to Trust B, but instead were placed into a bank account that was jointly managed by himself and Rose."

21

"[S]imilarly, [Joseph] testified that he knew of the Chevy Chase . . . property sale as it was pending in 2011 and that the proceeds of that sale did not go into the C trust."

The trial court observed further that the "May 18 date of discovery as to when the trust funds were not properly allocated [was] not the only date [Joseph] included in the TAP that [was] not supported by the evidence. . . . [In the TAP, Joseph] allege[d] that he first learned on or about June 16, 2015 that . . . Saul improperly transferred funds from the sale of the Sepulveda property for his own use. TAP at ¶ 20. However, in his November 12, 2014 declaration filed in [the Initial Probate Action, Joseph] testified that the proceeds of both of those real property sales were used to purchase bonds and that 'Saul has commandeered bond funds that were held in the Trust and [was] now using that property for his own personal advantage and profit.'"

The court observed that these particular misstatements by Joseph in the TAP could not be excused as mere "oversight or wishful thinking," because "these particular misstatements . . . are critical to this case[,]" and had been "made in direct response to [the trial court's] previous finding that the petition would be considered barred by the statute of limitations unless [Joseph] amended his petition to include 'specific details regarding how and when he discovered the pertinent facts' and that that discovery must have occurred less than three years prior to his October 3, 2017 filing."

The trial court also satisfied its obligation under section 128.7, subdivisions (d) and (e), explaining why nothing short of dismissal of the action would suffice under the circumstances to deter repetition of the improper conduct, and why a fee award was in order. The court "recogniz[ed] that terminating sanctions are reserved for the most egregious conduct. Given the significance of these allegations to [Joseph's] ability to maintain

22

this litigation (*i.e.*, without these allegations of delayed discovery, [Joseph's] entire case fails), given that they are wholly unsupported by the evidence, and given that the evidence is entirely [Joseph's] own testimony under oath, the Court finds that *nothing short of terminating sanctions [would] deter [Joseph] from continuing this conduct*. In addition, given that [Joseph] was presented with this evidence and argument prior to the filing of these [sanctions] motions [during the safe-harbor period], yet refused to withdraw the disputed pleading, the Court further finds it appropriate to award [Philip and Saul] their reasonable attorneys' fees and costs [of $5,685 and $6,460, respectively] in bringing [the] motions." (Italics added.)

In sum, the court gave Joseph ample opportunity to amend his petition, and explicit instructions as to what facts (coupled with evidentiary support) he needed to allege to avoid the statute of limitations. Moreover, prior to filing their motions for sanctions, both Saul and Philip provided Joseph's counsel copies of their motions and supporting evidence. The TAP that Joseph filed demonstrates that he and his counsel ignored the court's specific guidance provided in its ruling granting the demurrers to the SAP with leave to amend and chose not to take advantage of the safe-harbor period to withdraw a pleading that counsel knew contained false allegations on a critical point. Joseph and his counsel caused Saul and Philip to incur unnecessary legal fees. (See *Ruinello v. Murray* (1951) 36 Cal.2d 687, 690 [trial court can reasonably conclude that plaintiff is unable to amend complaint to fix identified deficiencies after several unsuccessful attempts to do so].) In filing the TAP, Joseph's attorneys "certif[ied] that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the new factual allegations had "evidentiary support or, if specifically so identified, [were] likely to have

23

evidentiary support after a reasonable opportunity for further investigation or discovery." (§ 128.7, subd. (b)(3).)[15]

For the foregoing reasons, the trial court did not abuse its discretion or otherwise err in concluding that the TAP was factually and legally frivolous.[16]

## DISPOSITION

The judgment is affirmed. Respondents Saul and Philip Markowitz are awarded their costs of appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

MANELLA, P. J.

CURREY, J.

---

[15]    The trial court did not find that Joseph or his counsel acted in bad faith, nor was it required to do so. Section 128.7, which "imposes a lower threshold for sanctions than . . . under [Code Civ. Proc.] section 128.5" does not require a showing of bad faith; the conduct under scrutiny need only be "objectively unreasonable" to justify sanctions. (*Guillemin, supra*, 104 Cal.App.4th at p. 167.)

[16]    We need not address Joseph's additional arguments that reversal is required, as none of those arguments pertain to the issue on appeal.

24